70 N.J. Super. 585 (1961)
176 A.2d 50
STATE OF NEW JERSEY, PLAINTIFF,
v.
JOHN P. CALLAGHAN COMPANY, MICHAEL SPRAGUE, JOSEPH DIROMA, FRANCIS X. KEEGAN, HENRY AGNEW AND CHARLES MEIER, DEFENDANTS.
Superior Court of New Jersey, Law Division  Criminal.
Decided November 29, 1961.
*587 Mr. Sanford M. Jaffe, Assistant Prosecutor (Mr. Brendan T. Byrne, Essex County Prosecutor, attorney), for the plaintiff.
*588 Messrs. McGlynn, Stein & McGlynn (Mr. Roger H. McGlynn, appearing), attorneys for defendants John P. Callaghan Company, Michael Sprague and Joseph DiRoma.
Mr. John J. Clancy, attorney for defendant Francis X. Keegan.
Mr. Joseph A. Hayden, attorney for defendants Henry Agnew and Charles Meier.
WAUGH, A.J.S.C.
The defendants move to dismiss certain indictments against them. Indictments No. 963, 964 and 965 charge the John P. Callaghan Company with violating N.J.S. 2A:111-1 by obtaining money by false pretenses with intent to defraud the Terminal Construction Corporation. Indictment No. 962 charges defendants John P. Callaghan Company, Francis X. Keegan, Henry Agnew, Charles Meier, Joseph DiRoma and Michael Sprague with violating N.J.S. 2A:98-1 by conspiring (1) to obtain money from the Terminal Construction Corporation under false pretenses, and (2) to cheat and defraud the public by providing ready-mix concrete not in accordance with the required specifications.
At argument the following factual context was developed. The Newark Parking Authority, a corporation created pursuant to N.J.S.A. 40:11A-1 et seq., engaged the Terminal Construction Corporation to construct an underground parking garage beneath Military Park in the City of Newark. Terminal contracted with the defendant Callaghan for the supply of ready-mix concrete in accordance with certain specifications as provided in the building contract. The Newark Parking Authority retained defendant Keegan, trading as Newark Testing Laboratories, to test the concrete and report the findings to the interested parties. Codefendants Agnew and Meier were employees of Keegan. Codefendant Sprague is president of defendant Callaghan and codefendant DiRoma is an employee of Callaghan.
*589 The Military Park garage collapsed while under construction. As a result of investigation of the collapse, the grand jury brought these four indictments. The State, however, concedes that it need not, at trial, prove the collapse was causally related to the alleged actions for purposes of proving the alleged charges against these defendants.
Indictments No. 963, 964 and 965 are worded in virtually identical terms except for the dates and the amounts of money involved. A decision on the validity on any one is controlling on the other two. The charging portion of indictment No. 963 reads as follows:
"* * * on the 9th day of February, 1960 and on divers dates between the 4th day of January, 1960, and the 31st day of January, 1960 * * * the John P. Callaghan Company * * * did, with intent to defraud, falsely pretend to the Terminal Construction Company * * * that it had delivered to the said Terminal Construction Corporation during the month of January, 1960, various quantities of ready-mix concrete containing specified amounts of cement, sand and gravel in each cubic yard thereof and that the cement contained therein was of a specified brand and type, whereas, in truth and fact as the said John P. Callaghan Company then and there well knew, the quantities of ready-mix concrete it had furnished to the said Terminal Construction Corporation during the month of January, 1960, contained lesser amounts of cement and gravel and greater amounts of sand than specified and contained brands and types of cement other than specified, and the said Terminal Construction Corporation relying upon the said false pretenses as true and being deceived thereby gave to the said John P. Callaghan Company and the said John P. Callaghan Company did then and there, knowingly and designedly, by color and means of said false pretense obtain from the said Terminal Construction Corporation money to the value of $35,221.32, of the goods and chattels of the said Terminal Construction Corporation with intent to cheat and defraud the said Terminal Construction Corporation."
Defendant attacks the indictment on the ground that it is too vague and indefinite in that it is impossible to determine whether the alleged pretenses committed were a single act or a series of acts. Its contention is that it is impossible to determine whether it is charged with obtaining one lump sum of money by several different false pretenses *590 or whether several sums of money were obtained by several different false pretenses. Defendant relies upon State v. Alfin, 129 N.J.L. 196 (Sup. Ct. 1942); State v. Fromm, 65 N.J. Super. 30 (App. Div. 1961), and State v. Torrance, 41 N.J. Super. 445 (App. Div. 1956), certification denied 23 N.J. 59 (1956).
The State's position is that between January 4 and January 31 Callaghan delivered the concrete and on February 9 the defendant received a final remittance for the concrete delivered in January, the false pretense thereby being consummated on February 9 and, clearly, the indictment charges but one false pretense. It contends that the "delivery of each load of concrete could not be construed to be a separate crime but merely a series of acts establishing a predicate for the crime which was substantially consummated"; and relies on State v. Thompson, 56 N.J. Super. 464 (App. Div. 1959), where an embezzlement charge was based on the defendant's failure to deposit monthly rentals and not on each collection from the tenants.
Only one offense may be charged in a count of an indictment. State v. Weleck, 10 N.J. 355, 375 (1952); State v. Bolitho, 103 N.J.L. 246, 263 (Sup. Ct. 1927), affirmed 104 N.J.L. 446 (E. & A. 1927). But an indictment is not duplicitous if it charges several acts relating to the same transaction which together constitute one offense. State v. Witte, 13 N.J. 598, 605 (1953).
The fundamental requirement of an indictment is to inform the person charged of the nature of the offense lodged against him so he may adequately prepare his defense and at the same time be protected against another indictment for the same offense. State v. Borrell, 18 N.J. 16, 21 (1955); State v. Winne, 12 N.J. 152, 178 (1953). It is the court's opinion that the indictment fulfills this requirement.
The indictment informs defendant that on February 9, 1960 and on divers dates between January 4 and January 31, the defendant falsely represented that it had *591 delivered concrete in accordance with the contractual specifications. In reliance on these representations, Terminal paid Callaghan the sum of $35,221.32. The indictment clearly charges the defendant with a scheme to defraud Terminal and each act alleged is a part of that scheme. By the nature of the operation, i.e., the numerous deliveries of concrete required to construct a project the size of the Military Park garage, Callaghan is reasonably informed as to the nature of the State's charge.
An analogous situation arose in State v. Ajamian, 9 N.J. Super. 143 (App. Div. 1950). In that case the indictment charged the defendant, as agent for one Isabelle Panian, entrusted with the care of moneys on her behalf, fraudulently converted her moneys to his use in specified amounts on dates between December 9, 1946 and February 28, 1947 in the sum of $14,679.10. The court held that several acts of embezzlement could be included in a single count, stating that "an unwarranted burden would be placed upon the State if it were obliged under the circumstances to meet any formal requirement of alleging and establishing the precise dates and amounts of the individual defalcations." The court stated at page 146:
"However, assuming the validity of the defendant's position that the indictment should have, as well it might have under the particular circumstances presented, embodied separate counts rather than a single count, we fail to find cause for reversal. In either event the sum of evidence would have been identical and the defendant would have been found guilty of embezzlement; * * * The indictment sufficiently set forth the facts, the defendant was afforded full opportunity to defend, and any error based on the failure to set forth separate counts did not affect his substantial rights or prejudice him in maintaining his defense upon the merits. [Citing cases]"
In State v. Witte, 13 N.J. 598 (1953), the defendant was convicted of nonfeasance in his office as chief of police of the Borough of Lodi. The indictment was in nine counts, count 1 charging the defendant for failing to take proper law enforcement action against a gaming house *592 which was continuously maintained from January 24, 1949 to and including March 31, 1949. The court stated at page 605:
"* * * Where an indictment charges `one continuous offense, constituted both by a series of acts and by a duration of time,' and `the time and the acts are properly proved, the offense is single and indivisible.' [Citing cases]"
Although that case is distinguishable in that a nonfeasance in office is by nature a continuous offense, the language is applicable to the indictment here in that the times of delivery are all set out as being in January  namely between January 4, 1960 and January 31, 1960, and the payment of $35,221.32 on February 9, 1960. Thus, we have a series of acts  within a duration of time and a single payment  a single false pretense charged. The defendant is clearly informed of the charge against him.
The cases cited in support of defendant's position are clearly distinguishable. In State v. Alfin, 129 N.J.L. 196 (Sup. Ct. 1942), the defendant obtained money by submitting false salary vouchers in a number of different names or set dates. The indictment charged him with obtaining money in the sum of $9,288.99 by false pretenses, by executing false and counterfeit vouchers "between the 18th day of July, 1941, and the 9th day of January." Clearly, it was impossible to tell whether the defendant was charged with taking one lump sum by false representations relating to several different fraudulent vouchers, or several different sums based on one or more vouchers. Here, Callaghan is charged with obtaining one lump sum by a series of false pretenses.
In State v. Torrance, 41 N.J. Super. 445 (App. Div. 1956), certification denied 23 N.J. 59 (1956), the defendant collected four semi-monthly salary checks without fulfilling the duties of his job. The case makes it clear that four checks were received on different dates, totaling the amount charged in the indictment. State v. Fromm, 65 *593 N.J. Super. 30 (App. Div. 1961) also included independent acts, of falsifying documents belonging to the Municipal Court of Westfield lumped into a single indictment. Here the indictments give clearly the dates of the delivery of the concrete and of the payment of the money.
The motions to dismiss indictments 963, 964 and 965 are denied.
Considering next indictment No. 962, which charges the defendants with violating N.J.S. 2A:98-1, that section states:
"Any 2 or more persons who conspire:
a. To commit a crime; or

* * * * * * * *
d. To cheat and defraud a person of any property by any means which are in themselves criminal; or
e. To cheat and defraud a person of any property by any means which, if executed, would amount to a cheat; or
f. To obtain money by false pretenses;

* * * * * * * *
are guilty of a conspiracy and each shall be punished * * * as for a misdemeanor."
The charging portion of the indictment states:
"* * * commencing on or about the 1st day of December, 1959, and continuing from thence until on or about the 15th day of March, 1960, in the City of Newark, in the County of Essex aforesaid and within the jurisdiction of this court, the said John P. Callaghan Company, Michael Sprague, Joseph DiRoma, Francis X. Keegan, Henry Agnew and Charles Meier unlawfully and with intent to defraud did combine, conspire, confederate and agree together;
(1) to obtain money from Terminal Construction Corporation by falsely pretending that the cement, sand and gravel furnished in the ready-mix concrete and delivered by the said John P. Callaghan Company to the Military Park project were in proportions specified to produce hardened concrete of a given compressive strength within a specified period of time and that the cement furnished was of the type and brand ordered by the said Terminal Construction Corporation notwithstanding that the said cement, sand and gravel were furnished in other than specified proportions and notwithstanding that the cement was of a brand and type other than that ordered by the said Terminal Construction Corporation;
*594 (2) to cheat and defraud the public by willfully, maliciously, and in violation of their contractual obligations, causing concrete having proportions of cement, sand and gravel other than that required to produce concrete having a given compressive strength within a specified period of time as required by the Newark Parking Authority by contract with the Terminal Construction Corporation and brand and types of cement other than specified to be delivered to the Military Park project."
First, the defendants argue that the indictment violates R.R. 3:4-7, which requires an indictment to charge only one offense or, in the alternative, aver separate offenses under the same counts. Their claim is that the indictment charges two separate and distinct offenses and is duplicitous and, therefore, defective, citing State v. Weleck, 10 N.J. 355 (1952), and State v. Bolitho, 103 N.J.L. 246 (Sup. Ct. 1927), affirmed 104 N.J.L. 446 (E. & A. 1927). In their view, two offenses are charged: (1) conspiracy to obtain money from Terminal, and (2) conspiring to cheat and defraud the public.
A criminal conspiracy is an agreement to do an unlawful act, or to do a lawful act by an unlawful means. State v. La Fera, 35 N.J. 75 (1961); State v. Carbone, 10 N.J. 329, 337 (1952). It is a well established principle that a single crime of conspiracy may include several unlawful objects of that conspiracy. State v. Profita, 114 N.J.L. 334, 338 (E. & A. 1934); State v. Spence, 36 N.J. Super. 314, 319 (App. Div. 1955).
Indictment No. 962 clearly charges a single conspiracy with two objects of that conspiracy. The court, therefore, finds that the indictment is not duplicitous.
Defendants further argue that the indictment should be dismissed because it, in effect, charges a "conspiracy to cheat and defraud the public." Their position is that N.J.S.A. 40:11A-1 et seq., the Parking Authority Law, provides that the authority shall be a completely separate and independent entity and body politic (citing DeLorenzo v. City of Hackensack, 9 N.J. 379 (1952), and State v. Parking Authority of the City of Trenton, 29 N.J. Super. *595 335 (App. Div. 1954)), and therefore is not the "public." Although the defendants admit the Authority is a public body (defendant Keegan's reply brief, page 11), they contend the "operation suggests a status more akin to private corporations" and "are not the public."
It is true that the parking authority contemplated by N.J.S.A. 40:11A-1 et seq., "although created by and in a municipality, is an independent public corporate entity, distinct and separate from the municipality." State v. Parking Authority of the City of Trenton, 29 N.J. Super. 335, 339 (App. Div. 1954), affirming 27 N.J. Super. 284 (Law Div. 1953). It cannot create an obligation or debt of the State or any political subdivision of the State. DeLorenzo v. City of Hackensack, 9 N.J. 379 (1952); N.J.S.A. 40:11A-9. As an independent corporate entity, its employees are not subject to the provisions of the Civil Service Act. State v. Parking Authority of the City of Trenton, supra.
In State v. Parking Authority of the City of Trenton, supra, the court, 29 N.J. Super., at page 337, describes the powers of the authority as enumerated in N.J.S.A. 40:11A-6:
"The Parking Authority Law authorizes the governing body of a municipality to establish a local parking authority. The authority so established is `a body corporate and politic' with perpetual succession. It may sue and be sued and make contracts, including agreements with the municipality; it may sell, buy or lease property; it may fix rates and collect charges for the parking privileges it provides; it may borrow money secured by mortgages on its property or pledges of its income; it may make by-laws and regulations to carry its power into effect. It must file an annual audit of its accounts with the Director of the Division of Local Government.
In recognition of the close relationship between the parking authority and the municipality, the Legislature provided that an authority may come into being only by the action of the governing body of the municipality, which is authorized to appoint the five commissioners of the authority. The act authorizes the municipality to cooperate with the authority by making loans and grants to it and in other ways assisting it in the accomplishment of the object for which it is established. However, the authority acts in its own name; it cannot bind the city by its actions. It transmits no *596 money to the municipality, but retains all revenue derived from the services of its employees and the use of its assets; from such revenue it meets all of its operating expenses including the compensation of its employees."
The language of the statute and the cases clearly indicate a legislative intention to create an independent body politic. However, it does not follow that the statute also intended to create a "private" corporate entity as well.
DeLorenzo, supra, indicates that the legislative purpose in enacting the Parking Authority Law was to leave the parking projects financed through revenue lands of the authority with such incidental aid as the municipality might be in a position to properly furnish from time to time, without obligating the local taxpayers, directly or indirectly, on the independent authority's revenue bonds. At page 389. State v. Parking Authority of the City of Trenton, supra, indicates that the purpose of such an act was to promote the public safety and convenience in relieving traffic congestion on municipal streets. (29 N.J. Super., at p. 337.) As indicated in DeLorenzo, the maintenance of off-street parking facilities designed to relieve traffic congestion clearly constitutes a proper public purpose. (9 N.J., at pp. 384-5.) See also Camden Plaza Parking v. City of Camden, 16 N.J. 150, 154-5 (1954).
The Legislature has provided a means to relieve the problem by establishing an independent authority, and the public remains the beneficiary of the authority's acts. It does not follow that by creating an independent authority the Legislature intended the municipalities to abdicate their responsibilities on behalf of a strictly private corporation. On the contrary, the authority is merely "an agency and instrumentality of the municipality or county creating it" for the purpose of carrying out the municipality's duty to provide off-street parking in relieving traffic congestion.
The Parking Authority of the City of Newark clearly is within the definition of a "public corporation" as stated in *597 the Dartmouth College case, 4 Wheat. 517, [518], 4 L.Ed. 629 (1819), and quoted in Joseph v. Passaic Hospital Ass'n, 35 N.J. Super. 450, 456 (Ch. Div. 1955), reversed on other grounds 38 N.J. Super. 284 (App. Div. 1955):
"`Public corporations are generally esteemed such as exist for public political purposes only, such as towns, cities, parishes, and counties; and in many respects they are so, although they involve some private interests; but strictly speaking, public corporations are such only as are founded by the government for public purposes, where the whole interests belong also to the government. * * *" (Emphasis added)
Provisions in the statute further substantiate the court's conclusion. The authority shall be "a public body corporate and politic and a political subdivision of the State." N.J.S.A. 40:11A-3 defines "authority" or "parking authority" or "authorities" or "parking authorities" to mean "any of the public corporations created pursuant to this act." (Emphasis added)
The act also grants the authority certain powers which are generally characteristic of corporations that serve the public interest. N.J.S.A. 40:11A-7 gives the Authority the right to exercise the power of eminent domain, and N.J.S.A. 40:11A-15 exempts property from judicial levy. The authority's property is declared "to be public property of a political subdivision of the State and devoted to an essential public and governmental function and purpose," and shall be exempt from taxes and assessments. N.J.S.A. 40:11A-19. Its bonds have the same exemptions as that of municipal or "public" bonds. N.J.S.A. 40:11A-19. R.S. 40:11A-13 provides the remedy of a proceeding in lieu of prerogative writs to an obligee on a bond. And, finally, N.J.S.A. 40:11A-6 states:
"(1) Every parking authority shall constitute a public body corporate and politic and a political subdivision of the State with the same territorial boundaries as the boundaries of the municipality or county creating the authority, exercising public and essential governmental functions, and having all the powers necessary or convenient *598 to carry out and effectuate its corporate purposes and the purposes and provisions of this act."
The court concludes that N.J.S.A. 40:11A-1 et seq. intended the authority to be a political subdivision of the State, similar to that of a municipality, and a public corporation created for a public purpose, namely, to relieve traffic congestion by providing off-street parking facilities. As a political subdivision of the State, a conspiracy to defraud that entity is equivalent to a conspiracy to defraud the public. See 15 C.J.S. Conspiracy § 55, and cases cited therein; State v. Norton, 23 N.J.L. 33 (Sup. Ct. 1850); State v. Ellenstein, 121 N.J.L. 304, 314 (Sup. Ct. 1938); State v. O'Brien, 136 N.J.L. 118, 124 (Sup. Ct. 1947); State v. Young and Stainsby, 37 N.J.L. 184, 187-188 (Sup. Ct. 1874).
For the above reasons the court need not consider the defendant's contention that the portion of the indictment charging a conspiracy to cheat and defraud the public is defective because (1) it does not fall within the language of N.J.S. 2A:98-1(d) or (e), and (2) it is not a common law conspiracy.
Defendant makes further attacks against the indictment under the rule of law which states that where the substantive offense necessarily involves a concert of action, a charge of conspiracy to commit that offense will not lie. They urge that the objective of the indictment could not have been consummated without joint action of the parties, i.e., the delivery of substandard materials by Callaghan and certification by Keegan required joint action, and therefore the above rule should apply.
However, the rule applies only where the offense is one which can only be committed by concerted action of the two parties; for example fornication, abortion, bigamy, etc. As the State suggests, State v. Lennon, 3 N.J. 337 (1949), is more pertinent here. There the Supreme Court upheld a conviction for conspiracy to violate the bookmaking statutes, refusing to accept the defendant's argument *599 that "a man cannot wager with himself." The court held that the object of the conspiracy was the "making of a book of bets," and the defendant conspired to violate statute prohibiting such acts.
In this case there are two objects of the conspiracy: (1) to obtain money from Terminal by false pretenses, and (2) to cheat and defraud the public. Each is a crime which does not require concerted action. Therefore, under the rule as applied in State v. Lennon, supra, indictment No. 962 is not defective.
The defendant's final argument is that the indictment fails to charge a crime. They state that although the charging portion pleads a disparity between the materials delivered and the materials ordered, it does not allege that the materials delivered were either substandard or of a quality below that of the type ordered.
The nature of the crime of conspiracy is discussed in State v. Carbone, 10 N.J. 329 (1952), at pages 337, 338:
"The gist of the offense of conspiracy lies, not in doing the act, nor affecting the purpose for which the conspiracy is formed, nor in attempting to do them, nor in inciting others to do them, but in the forming of the scheme or agreement between the parties. * * * The offense depends on the unlawful agreement and not on the act which follows it; the latter is not evidence of the former. * * * The combination itself is vicious and gives the public an interest to interfere by indictment. * * * The external or overt act of the crime is concert by which initial consent to a common purpose is exchanged. * * * In order to render one criminally liable for conspiracy at common law, it must be shown that he entered into an agreement as thus defined with one or more persons, whether charged with him in the indictment or not, and whether known or unknown. * * *"
An indictment for conspiracy to defraud need not set forth the means agreed upon by the conspirators. State v. Ellenstein, 121 N.J.L. 304, 314 (Sup. Ct. 1938); Madden v. State, 57 N.J.L. 324 (Sup. Ct. 1894); State v. Young, 37 N.J.L. 184, 187 (Sup. Ct. 1874). Young, supra, is directly in point. There, the defendants were *600 charged with a conspiracy to cheat and defraud the mayor and common council of the City of Newark. The overt acts are spelled out in the subsequent language of the indictment. The court held that the indictment sufficiently spelled out the offense of conspiracy. No. 962 clearly informs the defendants of the conspiracy charge. It even goes one step further by suggesting that the means of obtaining their criminal objective was by failing to deliver the concrete in accordance with the terms of the contract. It is not, therefore, defective for failing to specify the means.
Defendants further argue that the indictment must fall because it does not specifically charge the defendants with scienter (i.e., knowledge of the false pretense).
Again, we emphasize that it is the agreement which constitutes the crime of conspiracy. Carbone, supra; La Fera, supra.
In State v. D'Auria, 4 N.J. Super. 319 (App. Div. 1949), the defendant was accused of conspiring to defraud by selling a stolen auto, and the court held that the indictment need not contain a separate allegation that the defendant knew the car was stolen. It held that the charge of conspiring to defraud by selling a stolen auto connoted the required design and guilty knowledge. The case is analogous to the one before us which charges a conspiracy to obtain money by falsely pretending that the cement was in accordance with the terms of the contract. This, too, would imply the necessary knowledge of falsity of the pretense. See also U.S. v. Stone, 135 F. 392 (D.N.J. 1905).
For the reasons aforesaid, the court finds that indictments No. 962, 963, 964 and 965 are proper as to form and substance and, therefore, the motions to dismiss the indictments are denied.