STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. NEW JERSEY TRADE WASTE ASSOCIATION, ET AL., DEFENDANTS, AND LAWRENCE RICCI, ALSO KNOWN AS LARRY POPPOLA, DEFENDANT-RESPONDENT, AND TINO FIUMARA, DEFENDANT-INTERVENOR-RESPONDENT.

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. NEW JERSEY TRADE WASTE ASSOCIATION, ET AL., DEFENDANTS, AND MICHAEL COPPOLLA, DEFENDANT-RESPONDENT.

Argued January 10, 1984—Decided March 21, 1984.

See also 191 N.J.Super. 144.

*Allan J. Nodes,* Deputy Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *John K. Enright,* Deputy Attorney General, on the brief).

*Thomas J. Cammarata* argued the cause for respondent Lawrence Ricci, etc. (*Shaljian, Cammarata & O'Connor,* attorneys).

*Miles Feinstein* argued the cause for respondent Michael Coppolla (*Feinstein, Bitterman & Schey,* attorneys).

*Michael Critchley* submitted a brief on behalf of intervenor-respondent Tino Fiumara (*Critchley & Roche,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal requires us to determine the perimeters of a complex antitrust conspiracy. Specifically, the issue is whether the trial court was correct in dismissing the indictments against defendants Lawrence Ricci, Michael Coppolla, and Tino Fiumara alleging violation of the New Jersey Antitrust Law, *N.J.S.A.* 56:9–1 to –19.[1] Resolution of this issue requires first a decision whether the trial court was correct that two separate and distinct conspiracies were improperly included in the one count indictment. It then requires a decision whether, drawing every reasonable inference in favor of the State, sufficient evidence was presented to the grand jury to establish a *prima facie* case

---

[1]Before we heard oral argument, the State agreed not to oppose a different motion to dismiss the indictment pending against Fiumara. Fiumara had been returned to federal prison where he was serving concurrent federal prison terms of 20 years for extortion in New York. Pursuant to the Interstate Agreement on Detainer Act, *N.J.S.A.* 2A:159A–3(d), the indictment was not "of any further force or effect" after the return of Fiumara to his original place of imprisonment.

that defendants were part of the conspiracy in restraint of trade in the garbage collection industry. We find that the indictments were neither duplicitous nor deficient for lack of sufficient evidence. We therefore hold that the indictments were improperly dismissed.

I

Defendants were 3 of 57 individuals and businesses indicted by a state grand jury under the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 to –19, for knowingly engaging in "a combination and conspiracy in unreasonable restraint of the business of providing garbage collection services to customers" in nine Northern New Jersey counties. The indictment described the conspiracy as a "continuing agreement, understanding and concert of action among the defendants and coconspirators that [the defendants] would not compete for garbage collection among themselves." The indictment alleged that certain companies and individuals in the garbage collection business formed the New Jersey Trade Waste Association (Association) to effect and enforce the agreement. It also charged defendants with aiding and advising in the conspiracy; they were not identified specifically as members of the Association.

As part of the operation of the conspiracy, an Association member allegedly acquired "property rights," which were understood by the conspirators to be a claim of ownership to the exclusive right to provide garbage collection service to a location without competition from other collectors. Competition was barred regardless of a change in the use of the location or the identity of the customer occupying it. Property rights belonged to the first Association member to serve a given place. In the event of a dispute, a "grievance hearing" determined who owned the property rights to a specific stop. The Association held weekly meetings to hear grievances arising from conflicting property right claims to customer accounts.

The indictment alleged that defendants intimidated nonmembers, coerced them to join the Association, retaliated against anyone who interfered with the Association, prohibited sales of certain customer accounts, and exacted money from each member to guarantee noncompetition. The indictment also gave three illustrations of the conspirators' enforcement of property rights to restrain trade. Two illustrations concerned the enforcement of property rights by grievance hearings conducted by the Association. The third illustration, contained in paragraph 9(c) of the bill, was the only part of the indictment that specifically named the defendants.[2]

This part of the indictment charged that defendants ordered Anthony Tomae, an Association member who wished to sell his garbage collection business, to sell to someone they selected. They advised Tomae that Carmine Franco, the Association's President, had to approve the sale; otherwise, Franco would take over Tomae's customers. Defendants also wanted to obtain a three per cent fee on the sale. According to the indictment, Tomae successfully resisted the pressure.

---

[2]Paragraph 9(c) provides:

(c) During the period of the conspiracy and in the relevant area Anthony Tomae, a garbage collector and member of the T.W.A., sought a buyer for his garbage collection business. TINO FIUMARA, MICHAEL COPPOLLA and LAWRENCE RICCI also known as LARRY POPPOLLA, instructed and directed Anthony Tomae through an unindicted co-conspirator to sell his garbage collection business to a party of their choosing. FIUMARA, COPPOLLA and RICCI advised Tomae that as a member of the T.W.A. he had to clear the sale through CARMINE FRANCO, President of the T.W.A. They further advised Tomae that if he refused to abide by their instruction and deal through CARMINE FRANCO his customer accounts would be solicited and taken by CARMINE FRANCO. Moreover, it was the intention of FIUMARA, COPPOLLA and RICCI to obtain a fee of three per cent on the sale.

Tomae successfully resisted the instruction and direction emanating from FIUMARA, COPPOLLA and RICCI by using the influence and pressure of other persons who were not members of the T.W.A. nor engaged in the business of garbage collection, but who exercise power and influence equal to that of FIUMARA, COPPOLLA and RICCI.

The record contains excerpts from the testimony presented to the grand jury. Several witnesses testified concerning the Association's general activities. Only Patrick Kelly, a police informant who participated in the undercover investigation, specifically mentioned each of the three defendants in his testimony.[3]

Kelly testified that Fiumara, Coppolla, and Ricci were his associates in the criminal world. Fiumara was the head of a group that functioned as a cog in a larger group engaged in criminal activities. Coppolla was subordinate to Fiumara; Ricci was subordinate to Coppolla. Kelly testified that Franco, the president of the Association, answered to Fiumara, who effectively controlled the Association.

Kelly testified that the activities of Fiumara and Coppolla in the Tomae transaction were motivated by a desire for control as well as financial gain. He stated:

A. They were looking for both financial, three points over the sales price and control of the buyer that bought the route.

Q. How would this control be affectuated [sic]; was there any "legitimate organization" that they operated through?

A. There was an organization. New Jersey Trade Waste Association.

Q. And did that control extend into that association?

A. Yes; it did.

Q. Who was their control, contact or party within that association?

A. A person named Carmine Franco.

In excerpts of tape recordings made by Kelly of conversations on June 9, 1977, the grand jury heard Coppolla tell Ricci and Franco of the need to obtain an agreement not to compete from the Fiore brothers, the individuals to whom defendants wanted Tomae to sell his route. As Coppolla noted, "[a]t least with these kids I gotts [sic] ask for an agreement that they're not gonna rob each others [sic] work. You know."[4] The grand jury

---

[3]Harold Kaufman, another witness, specifically mentioned Fiumara in his testimony.

[4]Kelly explained that remark as follows:

also heard Ricci and Franco, during the same conversation, discuss "somebody from the city" who was interested in the Tomae route. According to Kelly's testimony, the discussion of that "somebody" revealed that he was coming for "permission to buy." [5]

Additionally, the grand jury heard excerpts from conversations that occurred on June 8, 1977. It heard Coppolla remark to Ricci and Kelly about an offer to purchase a member's route: "And let them [Tomae] say no and we'll let them go do something better and we'll take the [expletive] big stop off them and let him go see who he [expletive] want then. Ya know." It also heard Fiumara's remark that "[i]f they [Tomae] don't sell it they're gonna be a lot of trouble . . . Franco will take the stops from him. Take those two big stops right away."

Finally, the grand jury heard Coppolla's appraisal of the Tomae situation. Coppolla suggested that everyone knew Tomae joined the Association because "[he] knew he couldn't sell it." He then noted that "[y]a know, when you sell a business

---

Q. What does he mean by that; would you tell the Grand Jury or indicate for the record what he meant by that?

A. Well, if Mr. Coppola [sic] arranged the sale of the Tomae garbage route he would have to guarantee that the buyers would not lose any stops and that no other garbagemen would try to go in and interfere with the stops that went with the Tomae route.

Q. All right, and would there be any obligation on the buyer with respect to taking of other people's stops; is that inherent in that at all?

A. Yes, and the new buyer would also only be able to service the stops bought on the Tomae route or, again, any new stops that he was given permission to take.

[5]That conversation proceeded as follows:

Franco: Yeah, I know the guy. I know the guy, the guy came to us. I told him (interrupted). He needed help fot [sic] the samething [sic]. Yeah, he came to us for that. Okay so, eh ____ and his friend he came to us.

Ricci: Everything seems to revert back to the same thing again. Isn't that right? (laughter)

Franco: The friend came to us cause you know there's no deal unless you guys say alright. Okay? So that's what it is.

like this, there's other people involved there. That wise guys are involved."[6]

## II

Defendants do not challenge the evidence presented to the grand jury regarding their participation in the Tomae transaction. Instead, they argue that such participation does not constitute a conspiracy to violate the antitrust laws of this State, but is merely evidence of an unrelated alleged conspiracy to extort money from a member of the Association who was attempting to sell his garbage business.

Accordingly, defendants filed a motion to dismiss the indictment because it charged multiple conspiracies in one count in violation of the due process principles enumerated in *Kotteakos v. United States,* 328 *U.S.* 750, 66 *S.Ct.* 1239, 90 *L.Ed.* 1557 (1946). Alternatively, defendants sought to strike from the indictment certain language describing the Tomae transaction on the grounds that it evidenced a separate and distinct conspiracy from the alleged antitrust conspiracy. The State, however, argued that the main conspiratorial goal alleged in the conspiracy indictment was the monopolization of the garbage industry to create an artificial inflation of the value of the businesses belonging to members of the Association, and that the Tomae transaction was an overt activity engaged in by these defendants to reach that goal. The indictment, therefore, should not be dismissed.

---

[6]That entire portion of the conversation reads as follows:

Coppolla: Could you do it tonight? Call him, meet him, explain to him. Look this that, you know, let him be aware that everybody else is aware of the reason he joined this association. Cause he knew he couldn't sell this thing.

(inaudible)

Coppolla: He knew he couldn't sett [sic] it. Yeah, I mean just ah, you don't be too cocky at twenty to one. Ya know, when you sell a business like this, there's other people involved there. That wise guys are involved.

The trial court ruled that the indictment charged two separate conspiracies: one to restrain trade, and the other to extort money. Nevertheless, the court refused to dismiss the indictment. Instead, it struck the langauge concerning the Tomae transaction, the alleged second conspiracy. Immediately thereafter, Ricci moved for an order dismissing the indictment against him on the grounds that the only evidence pertaining to him was his participation in the Tomae transaction. The trial court granted Ricci's motion and the State appealed. Thereafter, Fiumara and Coppolla each successfully moved to dismiss the indictments against them on the same grounds.

Because the dismissal orders were signed 12 months apart, the State brought two separate appeals—one in the *Ricci* case and one in the *Fiumara* case. The Appellate Division in the *Ricci* case affirmed the trial court's dismissal of the indictment, one judge dissenting. The Appellate Division in the *Fiumara* case reached the opposite conclusion. It reversed the trial court's dismissal of the indictment against Fiumara, one judge dissenting, agreed with the dissent in the *Ricci* case, and held that the Tomae transaction was "symptomatic of the [Association] conspiracy, not distinct from it." In both cases, the losing parties appealed as of right to this Court. *R.* 2:2–1. We granted Coppolla's subsequent motion for direct certification to this Court. 95 *N.J.* 201 (1983).

We now reverse the Appellate Division judgment in the *Ricci* case as well as the trial court's dismissal of the indictment in the *Coppolla* case.[7]

## III

Whether an indictment should be dismissed or quashed lies within the discretion of the trial court. Such discretion should not be exercised except on "the clearest and plainest

---

[7]The *Fiumara* case is now moot. See footnote 1 *supra*. If it were not moot, we would affirm the Appellate Division judgment.

ground" and an indictment should stand "unless it is palpably defective." *State v. Weleck,* 10 *N.J.* 355, 364 (1952) (quoting *State v. Davidson,* 116 *N.J.L.* 325, 328 (Sup.Ct.1936), and *State v. Russo,* 6 *N.J.Super.* 250, 254 (App.Div.1950)); *State v. Porro,* 175 *N.J.Super.* 49, 51 (App.Div.1980). Similarly, if an indictment alleges all the essential facts of the crime, the charge is sufficiently stated and the indictment should not be dismissed unless its insufficiency is "palpable." *See State v. LaFera,* 35 *N.J.* 75, 81 (1961); *see generally R.* 3:7–3 (requiring a written statement of the essential facts constituting the crime charged).

 These defendants are charged with knowingly aiding and advising in the conspiracy to restrain trade in the garbage collection business. *N.J.S.A.* 56:9–18 provides that the New Jersey Antitrust Act shall be construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes. An examination of federal law as well as state law is therefore necessary to determine the essential elements of this crime.

Under the Sherman Act, 15 *U.S.C.* § 1, the agreement to restrain trade itself is the violation. No overt act need be charged in an antitrust conspiracy indictment nor need any such acts be proved at trial. *See United States v. United States Gypsum Co.,* 438 *U.S.* 422, 436 n. 13, 98 *S.Ct.* 2864, 2873 n. 13, 57 *L.Ed.*2d 854, 869 n. 13 (1978); *United States v. Socony-Vacuum Oil Co.,* 310 *U.S.* 150, 219–20, 60 *S.Ct.* 811, 842–43, 84 *L.Ed.* 1129, 1166 (1940); *Interstate Circuit, Inc. v. United States,* 306 *U.S.* 208, 221, 59 *S.Ct.* 467, 472, 83 *L.Ed.* 610, 617 (1939); *United States v. Gillen,* 599 *F.*2d 541, 543–46 (3d Cir.1979). While evidence of specific acts often is produced or alleged, its function is to provide a basis from which to infer agreement. *Cf. Interstate Circuit, Inc. v. United States, supra,* 306 *U.S.* at 221, 59 *S.Ct.* at 472, 83 *L.Ed.* at 617 ("As is usual in cases of alleged unlawful agreements to restrain commerce * * * "[i]n order to establish agreement [the government] is compelled to rely on inferences drawn from the course of conduct of the alleged conspirators.") Accordingly, there was no need for the State to

provide examples of overt acts by conspirators or to illustrate the actual operation of the conspiracy as long as the State had a basis for alleging an agreement.

Whether intent as well as agreement must be alleged may depend upon the type of violation involved. A "rule of reason" violation of antitrust law requires proof of intent as well as proof of agreement to restrain trade, *United States v. United States Gypsum Co., supra,* 438 *U.S.* 422, 98 *S.Ct.* 2864, 57 *L.Ed.*2d 854, while a *per se* violation may require proof of agreement only, *United States v. Gillen, supra,* 599 *F.*2d at 543–46.[8] The State contends that this case involves a *per se* violation. We need not determine, however, whether the indictment set forth a *per se* or "rule of reason" violation, for from the facts set forth in the indictment, intent as well as agreement may be inferred.

Defendants allege that one additional element is essential. They claim that individuals must be directly engaged in the line of commerce affected by the trade restraint to be subject to antitrust prosecution. This proposition finds no support under either federal or state antitrust law.

The application of the federal antitrust laws to individuals who do not engage in the business affected by the anticompetitive conduct was established in *United States v. Patten,* 226 *U.S.* 525, 541, 33 *S.Ct.* 141, 57 *L.Ed.* 333, 341 (1913), where the Supreme Court stated:

> Section 1 of the [Sherman Act] * * * is not confined to voluntary restraints, as where persons engaged in interstate trade or commerce agree to suppress competition among themselves, but includes as well involuntary restraints; as where persons *not so engaged conspire to compel action by others,* or to create artificial conditions, which necessarily impede or burden the due course of such

---

[8]Arguably, however, all New Jersey Antitrust violations have an intent requirement. *N.J.S.A.* 56:9–1 provides that "[a]ny person or corporation, or any officer or agent thereof, who shall *knowingly* violate any of the provisions of this act or aid or advise in such violation * * * is guilty of a misdemeanor." (Emphasis added.)

trade or commerce, or restrict the common liberty to engage therein. (Emphasis added.)

*See also Duke & Co. v. Foerster,* 521 *F.*2d 1277, 1282 (3d Cir.1975) (government officials may be named as defendants in antitrust suits).

The inclusion of persons in antitrust prosecutions who do not engage in the line of commerce allegedly restrained is specifically recognized in the New Jersey Antitrust Act. *N.J.S.A.* 56:9–11 provides in pertinent part:

Any person or corporation, or any person or agent thereof, who shall knowingly violate any of the provisions of this act or *aid or advise in such violation* * * * is guilty of a misdemeanor. (Emphasis added.)

The key element, therefore, is agreement or aiding and advising an agreement.

## IV

It is well settled in this State that separate and distinct offenses cannot be charged in the same count of an indictment. *R.* 3:7–6. *See, e.g., State v. Weleck, supra,* 10 *N.J.* at 375; *State v. Bolitho,* 103 *N.J.L.* 246, 263 (Sup.Ct.), aff'd 104 *N.J.L.* 446 (E. & A. 1927); *State v. Siebert,* 126 *N.J.Super.* 534, 536 (App.Div. 1974). This rule against duplicity protects defendants from prejudice. As the Court of Appeals for the Third Circuit explained in *United States v. Starks,* 515 *F.*2d 112, 116–117 (3d Cir.1975):

Duplicity is the joining in a single count of two or more distinct and separate offenses. One vice of duplicity is that a general verdict for a defendant on that count does not reveal whether the jury found him not guilty of one crime or not guilty of both. Conceivably this could prejudice the defendant in protecting himself against double jeopardy. Another vice of duplicity is that a general verdict of guilty does not disclose whether the jury found the defendant guilty of one crime or of both. Conceivably, this could prejudice the defendant in sentencing and in obtaining appellate review. A third vice of duplicity is that it may prejudice the defendant with respect to evidentiary rulings during the trial, since evidence admissible on one offense might be inadmissible on the other. Joining conspiracy and substantive offenses in the same count present this vice in a particularly aggravated form, because of the admissibility of declarations made by coconspirators. Assuming such a joinder, and a general guilty verdict, there would ordinarily be no way of discerning whether the jury found the defendant guilty of the offense in proof of which such coconspirator's admissions

were properly admitted. Finally, there is no way of knowing with a general verdict on two separate offenses joined in a single count whether the jury was unanimous with respect to either. (Footnotes omitted.)

Because the offense here consists of agreement and not any overt act, an indictment under the New Jersey Antitrust Act is not duplicitous if it charges several acts relating to the same transaction and such acts together constitute one offense. As the Court reasoned in *State v. John P. Callaghan Co.,* 70 *N.J.Super.* 585, 594 (Law Div.1961), the "single crime of conspiracy may include several unlawful objects of that conspiracy." An indictment depicting both objects is not duplicitous. *Id.*

Nor is an indictment duplicitous merely because each act itself might be criminal. *Id.* at 590 (citing *State v. Witte,* 13 *N.J.* 598, 605 (1953)). A "single crime of conspiracy may include several unlawful objects of that conspiracy," *id.* at 594, as long as the acts relate to a single transaction or common plan. *Cf. State v. Burgess,* 97 *N.J.Super.* 428, (App.Div.1967) (a conspiracy to obtain money by false pretenses with one coconspirator was separate from a conspiracy to obtain money by false pretenses with different coconspirators where no common scheme was demonstrated). The key is that the acts charged must relate to the single transaction that constitutes the offenses charged in the indictment. This conclusion is reasonable. To hold otherwise would mean that any indictment that alleges facts concerning the commission of a lesser crime would be duplicitous. For example, if several individuals conspire to rob a bank and the State is presenting evidence that alleges the theft of a car in furtherance of the conspiracy, evidence of that theft should not be excluded merely because theft constitutes a separate crime.

In this case, the agreement in restraint of trade in the garbage collection business was the single transaction or common plan. If the attempted extortion from Tomae occurred in furtherance of the antitrust conspiracy, the indictment was not duplicitous. The question is whether the Tomae transaction itself demonstrates an attempt to enforce an agreement in

restraint of trade, not whether the Tomae transaction. was a different type of act from the grievance hearings cited as, and conceded to be, valid examples of the conspiracy.

In determining whether a course of conduct constitutes a single criminal conspiracy or two or more separate conspiracies, courts have employed two different analyses: the "nature of the enterprise" approach and the "totality of the circumstances" approach. *See* Note, " 'Single vs. Multiple' Criminal Conspiracies: A Uniform Method of Inquiry for Due Process and Double Jeopardy Purposes," 65 *Minn.L.Rev.* 295, 301–04 (1980). Under the "nature of the enterprise" test, conspiracies are described by structure as either "hub of the wheel" conspiracies, in which there is a central figure through whom objectives are achieved, *see Kotteakos v. United States, supra,* 328 *U.S.* 750, 66 *S.Ct.* 1239, 90 *L.Ed.* 1557, or "chain/link" conspiracies, in which each link is related to the whole chain only by implication, *see United States v. Leong,* 536 *F.*2d 993 (2d Cir.1976). Antitrust conspiracies, however, are more commonly defined as either horizontal or vertical. *See State v. Lawn King, Inc.,* 84 *N.J.* 179, 191 (1980). Vertical antitrust conspiracies involve people who operate at different levels of the distribution chain. Horizontal conspiracies, on the other hand, involve people who operate at the same level of the distribution chain. *See id.*

Here, unlike the *Kotteakos* line of cases, there are no unrelated transactions or various levels of distribution involved in the conspiracy. Rather, the conspiracy alleged is a classic horizontal conspiracy in restraint of trade, for it operates on one level and requires the cooperation of all the coconspirators. The State argues that the "nature of the enterprise" test is not suitable as an analytical tool in such a case. A conspiracy of this kind is not a "hub of the wheel" conspiracy because the members of the conspiracy are organized generally on one level across-the-board rather than clustered around one conspirator. Further, the members of such a conspiracy are not "chain/link" in their organization because they do not function or interact in various discrete steps. Thus, the State urges that the "totality of the

circumstances" test be used in determining whether the Tomae transaction is part of the larger conspiracy.

Under the "totality of the circumstances" test, each case is decided on a case-by-case basis after examining all of the circumstances. *See, e.g., United States v. Tercero,* 580 *F.*2d 312, 316 (8th Cir.1978); *United States v. Mallah,* 503 *F.*2d 971, 986 (2d Cir.1974), *cert.* den., 420 *U.S.* 995, 95 *S.Ct.* 1425, 43 *L.Ed.*2d 671 (1975); *see generally* Note, *supra,* 65 *Minn.L.Rev.* at 310–17 (discussing the application of this test). The factors commonly considered under this test are the degree of interdependence needed for the overall operation to succeed, the extent to which purported conspiracies share a common objective, the time period during which the alleged acts took place, the locations in which the alleged acts took place, the similarity in the methods of operation, and the number of alleged overt acts in common. *See, e.g., United States v. Tercero, supra,* 580 *F.*2d at 316 (a conspiracy to import and distribute marijuana in Minnesota was part of the same conspiracy as a conspiracy to import and distribute marijuana in Arizona because there were significant, noncasual overlaps in personnel, the methods of operation were similar, the time frame was the same, and there was mutual dependence and support); *United States v. American Honda Motor Co.,* 271 *F.Supp.* 979, 985–87 (N.D.Cal.1967) (violation of the Sherman Act, 15 *U.S.C.* § 1, by conspiring to "fix, maintain; and stabilize" retail prices of motorcycles and parts in San Francisco was the same violation as conspiring to "fix, maintain and stabilize" retail prices of motorcycles and parts in Los Angeles, Illinois, and Ohio because there was a "common, continuing objective" to fix prices nationwide as well as regionally, as evidenced by each group's knowledge of the other's actions, and the purpose of fixing prices). It is not essential however, that all of these factors be present in each case to find that a single conspiracy rather than two or more conspiracies is present. *Compare United States v. Mallah, supra,* 503 *F.*2d at 983–86 (one conspiracy, although overt acts varied) *with United States v.*

*American Honda Motor Co., supra,* 271 *F.Supp.* at 985–87 (one conspiracy although time frame and locations varied).

## V

We agree with the State that the "totality of circumstances" test is the more useful for determining whether the Tomae transaction was part of and in furtherance of the main conspiracy. Applying this standard, we conclude that it was.

The indictment charges that the defendants engaged in a "conspiracy in unreasonable restraint of the business of providing garbage collection services, which * * * consisted of a continuing agreement, understanding and concert of action among the defendants and unindicted. coconspirators that the garbage collectors named herein would not compete for garbage collection business among themselves."

The main conspiratorial goal of the conspiracy was the artificial inflation of the value of the respective businesses of the conspirators. Customer routes of members of the conspiracy could be sold to other collectors at premium prices because the purchaser of these accounts could be assured that no conspirator-solid waste collector would solicit these customers.

The focal point of the agreement was a concept known as "property rights," an anticompetitive "rule" that granted the first solid waste collector to serve a particular location the exclusive right to provide such service for life. Among the methods allegedly used to protect these rights were: screening applicants for membership in the Association to make sure they would abide by property rights; threatening nonmembers of the Association who did not respect property rights; and requiring Association members to sell customer accounts only to those who would abide by property rights.

The Tomae transaction demonstrates how defendants, although not themselves garbage collectors, aided and advised the antitrust conspiracy in restraint of trade by enforcing the "property rights" scheme. Defendants acted as brokers in a sale of

routes after Tomae, a member of the Association, appeared willing to breach the scheme by selling to nonmembers of the Association. They threatened him with loss of customer accounts to Association members if he failed to clear the sale of his route through Carmine Franco, Association president. These events occurred while the Association was attempting to insure the continuation and growth of property rights. Thus, defendants tried to serve the screening function, which was vital to the conspiracy's success.

Clearly the Tomae transaction could be deemed an integral part of the conspiracy charged, primarily by virtue of its purpose to keep Tomae's solid waste customers within the sphere of the conspiracy. The importance of maintaining Tomae's route within the conspiracy is evident. An agreement between two collectors not to compete for each other's customers is of minimal impact if there are 50 other collectors in the same geographic area who do compete. When we understand that the Association consisted of 120 members out of 500 potential members within the Association's geographic area, it becomes clear that it was critical to the success of the conspiracy that nonmember firms respect the conspiracy or, better yet, be forced to join. The success of the conspiratorial agreement was in direct proportion to the number of members in the conspiracy. Increased membership in the conspiracy increased its potential for success.

Concomitantly, maintaining the *status quo* of the conspiracy was critical. If a member of the conspiracy sold its customers to a nonmember collector, the conspiracy was clearly weakened. It was precisely this latter situation that the defendants attempted to avoid in the Tomae episode.

Considering the totality of the circumstances, the grand jury reasonably could have found a single conspiracy. Although the overt acts differed, the Tomae transaction and the other two property rights enforcement schemes depended upon each other for success and shared a common goal. All three were for the maintenance of the "property rights" scheme, all three occurred

in the same place, Northern New Jersey, and all three took place at approximately the same time. Thus we find that the indictment was not duplicitous.

## VI

We also find that the evidence presented to the grand jury established that each defendant, through his participation in the Tomae transaction, promoted the antitrust conspiracy of the Association. In determining the sufficiency of the evidence to sustain the indictment, every reasonable inference is to be given to the State. Further, the evidence need not be sufficient to sustain a conviction, but merely sufficient to determine that there is *prima facie* evidence to establish that a crime has been committed.

An examination of the evidence presented to the grand jury makes it clear that the prosecutor made out a *prima facie* case that the defendants intended to participate in the conspiracy. That the Tomae transaction and the larger conspiracy were linked was demonstrated through Kelly's testimony and tapes. Kelly noted that the defendants wanted not only money but control over the buyer. Moreover, the grand jury heard tape recordings of conversations between Kelly, Fiumara, Coppolla, and Ricci in which they indicated that they knew the goal of the conspiracy. Coppolla, for example, suggested that Tomae joined the Association because he would get a higher price for his route as an Association member.

The grand jury also heard conversations in which defendants indicated their awareness that nongarbage collectors were an integral part of the system. Coppolla himself noted that when one sells a business like Tomae's, one knows "wise guys" are involved. In additional tape recordings of conversations, defendants, according to Kelly's testimony, discussed "somebody from the city" who was looking for "permission to buy" and that no deal was possible unless defendants approved it. Further, statements by Ricci in that same conversation suggested that

everything reverted back to "the same thing," *i.e.,* the condition that the purchaser join or be a member of the Association. Statements by Coppolla make it clear that the defendants knew that the Fiores, the individuals they wanted Tomae to sell to, had to agree to abide by the rules of "property rights" before they would be allowed to purchase the route.

Moreover, the tape composites presented to the State grand jury regarding the Tomae transaction contained several statements indicating that the defendants discussed the day-to-day operations of the Association with Franco and others and cooperated with the Association. Statements were made that a jury could find indicated cooperation and participation in restricting and directing how an operator's sale of his business was to be conducted and to whom the business was to be sold. In various conversations, the plural pronoun "we" was used collectively with reference to Franco and his activities.

These statements indicate an awareness that the purpose of the conspiracy was to increase the sale value of the conspirators' solid waste business. The grand jury, thus, could reasonably find that the actions of these defendants furthered and protected the "property rights" which were central to the conspiracy. The facts also support a finding that the defendants entered the conspiracy knowing its ultimate goal and that others were participating in the entire scheme. *See Blumenthal v. United States,* 332 *U.S.* 539, 558, 68 *S.Ct.* 248, 257, 92 *L.Ed.* 154, 168–69 (1947).

Thus, based on proofs presented to the grand jury, as well as the reasonable inferences to be drawn therefrom, there was sufficient evidence for the grand jury to charge that the defendants' actions aided and advised a conspiracy in restraint of trade in the garbage industry.

## VII

In conclusion, we agree with the dissent in the *Ricci* case and the majority in the *Fiumara* case that the one count indictment

was not duplicitous. The Tomae incident was symptomatic of the Association conspiracy, not distinct from it. It illustrated defendants' overall participation in the Association conspiracy.

Further, based on the evidence presented to the grand jury and the reasonable inferences drawn therefrom, evidence of defendants' participation in the overall Association conspiracy was sufficient to support an indictment for violation of the New Jersey Antitrust Act, *N.J.S.A.* 56:9–1 to –19. Thus, the indictments were improperly dismissed.

Accordingly, we reverse the Appellate Division judgment in the *Ricci* case and the trial court's dismissal of the indictment in the *Coppolla* case.

*For reversal* —Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.