825 A.2d 577 (2003)
361 N.J. Super. 349
STATE of New Jersey, Plaintiff-Respondent,
v.
Alex GRANT, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 14, 2003.
Decided June 25, 2003.
*579 Leslie B. Posnock, Ocean City, argued the cause for appellant (Schwartz & Posnock, attorneys; Ms. Posnock, on the brief).
John F. Loughrey, Assistant Prosecutor, argued the cause for respondent (John Kaye, Monmouth County Prosecutor, attorney; Mary R. Juliano, Assistant Prosecutor, of counsel and on the brief).
Before Judges KESTIN, FALL and WEISSBARD.
*578 The opinion of the court was delivered by WEISSBARD, J.A.D.
On December 20, 2001, Alex Grant was arrested and charged with the December 15, 2001 murder of his live-in girlfriend, Yvette Bacon. Defendant's bail was set at $1 million and he was remanded to the county jail where he has remained up to the present time.
The facts surrounding the homicide need not be recounted in detail except to note that defendant, who had no prior criminal convictions, claimed self-defense. Ms. Bacon had been stabbed eleven times, resulting in her death, while defendant, who was found at the scene, had been stabbed five times, three of the wounds being to his abdomen, resulting in life-threatening blood loss and multiple lacerations to his liver and bowel necessitating emergency surgery. Defendant was in the hospital for ten days. The victim's blood alcohol level was .304%, more than three times the legal limit; evidence of cocaine was also found in her blood and urine "consistent with its recent use." No toxicological tests were performed on defendant at the hospital. Two empty vodka bottles and apparent drug paraphernalia were found at the scene. While in the hospital, defendant made statements "to the effect that he had found Yvette in the house using drugs in front of her son, he threatened to call DYFS, and so Yvette had put a knife to his neck."[1] Defendant further stated that he and Yvette started to "wrestle," resulting in the altercation that led to his injuries and her death.
While the State's investigation also developed substantial facts inconsistent with defendant's self-defense claim, the defense certainly appeared to be viable. As a result, defendant's attorney entered into negotiations with the assistant prosecutor assigned to the case to have defendant testify before the grand jury. The assistant prosecutor agreed to the request. An agreement was reached between counsel that defendant, although in custody, would appear before the grand jury in *580 civilian clothes and would be neither handcuffed nor shackled. What happened thereafter is best set forth in the certification subsequently filed by defendant's attorney:
4. Mr. Grant was to testify on June 3, 2002. I was advised that, despite my agreement with the Monmouth County Prosecutor's Office, the Monmouth County Sheriff's Department had determined that Mr. Grant would be brought before the Grand Jury in handcuffs and leg shackles.
5. Based upon this information, on June 3, 2002, I called [the assistant prosecutor] and, with his consent, went to see the [judge] who was filling in for the [criminal presiding judge] at the time. I advised [the judge] of the charges against Mr. Grant, of his desire to testify before the Grand Jury, and of my objection to Mr. Grant's appearance before the Grand Jury in handcuffs and leg shackles. I argued to [the judge] that appearing in handcuffs and leg shackles would seriously prejudice the Grand Jurors against Mr. Grant. As a result of this conference, [the judge] ordered that Mr. Grant would not be required to wear handcuffs or shackles during the course of his Grand Jury testimony. [The judge's] decision was conveyed directly by [the judge] to Sheriff's Department Deputy Officer Roger Moore.
6. I thereafter accompanied Mr. Grant to his Grand Jury proceeding. As arranged, Mr. Grant wore civilian clothing. However, when we approached the Grand Jury room, the assigned Monmouth County Sheriff's Department Deputy Officer, Roger Moore, refused to remove Mr. Grant's handcuffs and leg shackles.
7. The Sheriff's deputy, when asked by both me and [the assistant prosecutor] to remove Mr. Grant's handcuffs and shackles, stated that when his department agreed to remove these restraints in response to [the judge's] order, they did not realize that Mr. Grant had been charged with murder. He further stated, in response to my inquiry, that the sole reason for requiring that Mr. Grant wear handcuffs and shackles was the nature of the charges against him, not any conduct by Mr. Grant during his incarceration. [The assistant prosecutor] advised the Sheriff's Deputy that he had no objection to the removal of Mr. Grant's restraints, and that he did not consider Mr. Grant to be dangerous. Despite this, the Sheriff's deputy refused to remove Mr. Grant's handcuffs and shackles.
8. Based upon this refusal, I, along with [the assistant prosecutor] conducted a telephone conference with [the judge] seeking removal of the handcuffs and shackles. I conveyed the facts to the Court. I stated that [the assistant prosecutor] had no objection to the removal and that the Sheriff's Deputy's sole basis for refusing to remove Mr. Grant's restraints was the nature of the charges against Mr. Grant. [The judge] made no further inquiry, and denied our application, stating that if the Sheriff's deputy wanted Mr. Grant to appear in handcuffs and shackles, he would remain handcuffed and shackled.
Defendant and his attorney then conferred and a decision was made that defendant would testify in restraints. When defendant entered the grand jury room, he was accompanied by two sheriff's officers who were identified as such to the grand jurors by the assistant prosecutor. The officers remained throughout defendant's testimony and escorted him from the room at its conclusion. Lest there be any doubt about defendant's status, the following colloquy *581 occurred between the assistant prosecutor and defendant at the outset:
Q. All right, Mr. Grant, let's first of all deal with the obvious facts as we spoke with your attorney, the fact that you're in handcuffs and leg shackles. You're currently at the Monmouth County Jail, correct?
A. Yes.
Q. And you've been in jail sinceor you've been actually at Monmouth County Jail since you got out of Jersey Shore Hospital on December 25th of last year 2001, correct?
A. Yes, sir.
Q. Okay ... I'm going to ask you to, maybe you could pull the microphone a little closer to yourself. Speak in a loud voice, Mr. Grant, so everybody in the room can hear what you have to say. All right? You've been in the county jail since December 25th, when you were taken from Jersey Shore Hospital to the jail, correct?
A. Yes, sir.
Q. And the very reason you're there is because your bail is very high. It's one million dollars, correct?
A. Yes, sir.
Q. And you've been unable to raise the funds to secure bail, correct?
A. Yes, sir.
Defendant proceeded to give the grand jury his version of the events of December 15, 2001. There is no contention that he was not permitted to give a full and unimpeded presentation, except for one incident. As defendant was describing the altercation, the assistant prosecutor wanted him to demonstrate certain aspects of the event. The following took place:
Q. Okay. But how did she do that? What I'm going to do, Officer, would it be okay if we uncuffed his hands and I want to give him a pencil and I want him just to demonstrate a couple of things.
OFFICER: Not a pencil. Do you have a smoother object?
A JUROR: Want my glass case?
[ASSISTANT PROSECUTOR]: What's that? Oh, a glass case. Okay, sure.
The demonstration ensued utilizing the eyeglass case.
Finally, during defendant's testimony it was elicited that he was a native of Costa Rica who had entered the country on a work visa some six years earlier, and that his work visa had expired in December 2000, about a year before the alleged crime. No further mention was made of his immigration status and there was no reference to his being in the country illegally.
On June 10, 2002, the grand jury reconvened to hear additional testimony and legal instructions. Nothing was said at any time about defendant's bail or immigration status or concerning his appearance in handcuffs and shackles. The instructions included a full discussion of self-defense, as well as an instruction on murder and aggravated manslaughter. On that same date, the grand jury returned an indictment charging defendant with murder, unlawful possession of a weapon and possession of a weapon for an unlawful purpose. While we do not know the breakdown of the vote, it was not unanimous.
Subsequently defendant moved to dismiss the indictment. That motion was denied by the criminal presiding judge who said:
There's no question but that they were aware that he was under arrest, and he was incarcerated from the time that he was found on that kitchen floor. Even though he was in Jersey Shore Medical *582 Center, he was still under arrest and still in custody. So there was no question in the jury's mind that he was in custody. The fact that he appeared in shackles and handcuffs was just an offshoot of the fact that he was still in custody.
So I don't find that was prejudicial to the defendant.
We granted defendant's motion for leave to appeal. Defendant presents the following issues for our consideration:
I. THE COURT ERRED IN FAILING TO DISMISS THE INDICTMENT.
II. DEFENDANT'S APPEARANCE BEFORE THE GRAND JURY IN RESTRAINTS REQUIRES DISMISSAL OF THE INDICTMENT.
III. IMPROPER REFERENCE TO DEFENDANT'S IMMIGRATION STATUS BEFORE THE GRAND JURY REQUIRES DISMISSAL OF THE INDICTMENT.
IV. THE PRESENCE OF TWO SHERIFF'S DEPUTIES DURING DEFENDANT'S GRAND JURY TESTIMONY VIOLATED RULE 3:6-6 AND REQUIRES DISMISSAL OF THE INDICTMENT.
The argument put forward under Point II requires that we balance two competing considerations. On the one hand is our commitment to a fundamentally fair grand jury presentation. See State v. Hogan, 144 N.J. 216, 231-32, 676 A.2d 533 (1996)(imposing upon prosecutors the duty to present the grand jury with "clearly exculpatory" evidence); State v. Murphy, 110 N.J. 20, 28-30, 538 A.2d 1235 (1988)(requiring dismissal of biased or partial grand jurors); State v. Del Fino, 100 N.J. 154, 164-65, 495 A.2d 60 (1985)(requiring that all grand jurors who vote to indict have heard all of the evidence presented to the grand jury including, if necessary, familiarization with testimony from missed sessions). The theme of these decisions, and others like them, is that the "grand jury has always occupied a high place as an instrument of justice in our system of criminal law." Murphy, supra, 110 N.J. at 36, 538 A.2d 1235; Del Fino, supra, 100 N.J. at 165, 495 A.2d 60. The concern is to preserve fundamental fairness by invoking the supervisory power of our courts, where appropriate, "to remedy perceived injustices in grand jury proceedings." Hogan, supra, 144 N.J. at 231, 676 A.2d 533. In this area, as in others, the Court has "extended greater protections to defendant's rights than have the federal courts." Ibid. (citations omitted).
On the other side is the acknowledged principle "that the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." United States v. Williams, 504 U.S. 36, 51, 112 S.Ct. 1735, 1744, 118 L.Ed.2d 352, 368 (1992)(quoted in Hogan, supra, 144 N.J. at 230, 676 A.2d 533). As a result, we have consistently adhered to the proposition that an indictment should not be dismissed "except on the clearest and plainest of grounds." State v. Perry, 124 N.J. 128, 168-69, 590 A.2d 624 (1991); State v. New Jersey Trade Waste Assn., 96 N.J. 8, 18-19, 472 A.2d 1050 (1984); see also State v. Wein, 80 N.J. 491, 501, 404 A.2d 302 (1979). Consistent with that view we have upheld the validity of indictments by grand juries presented with a variety of evidence that would have been inadmissible at trial. See, e.g., State v. Scherzer, 301 N.J.Super. 363, 428-29, 694 A.2d 196 (App.Div.)(prior bad acts), certif. denied, 151 N.J. 466, 700 A.2d 878 (1997); State v. Holsten, 223 N.J.Super. 578, 585-86, 539 A.2d 325 *583 (App.Div.1988)(hearsay and leading questions); State v. Engel, 249 N.J.Super. 336, 361, 592 A.2d 572 (App.Div.)(prior bad acts, incarceration and denial of bail), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991); State v. Schmidt, 213 N.J.Super. 576, 584, 517 A.2d 1226 (App.Div.1986)(hearsay), rev'd on other grounds, 110 N.J. 258, 540 A.2d 1256 (1988). The grand jury proceeding is not to be changed "from an ex parte inquest into a mini-trial." State v. Hogan, supra, 144 N.J. at 235, 676 A.2d 533.
Here, it is undisputed that it would have constituted reversible error if defendant had been compelled to appear at trial in handcuffs or shackles, at least in the absence of conduct by defendant necessitating such severe action. Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353, 359 (1970); State v. Damon, 286 N.J.Super. 492, 498-98, 669 A.2d 860 (App.Div.1996). The inherent and clearly recognized prejudice from such restraints is such that even the shackling of a defense witness at trial has been found to be error. State v. Smith, 346 N.J.Super. 233, 238-41, 787 A.2d 276 (App.Div. 2002). As Judge Ciancia observed, the shackling of the witness has the potential to detract from the witness's credibility. That observation applies, a fortiori, to a defendant. In the case of a defendant it also tends to undermine the presumption of innocence. Id. at 239, 787 A.2d 276. The general prohibition even applies in civil cases. United States v. Zuber, 118 F.3d 101, 103-04 (2d Cir.1997); Lemons v. Skidmore, 985 F.2d 354 (7th Cir.1993). That much said, the question remains whether such a shackling prohibition should carry over to grand jury proceedings.
In New York, two trial court decisions have addressed the issue of prejudice to a defendant resulting from appearing shackled before the grand jury. In People v. Marquez, 156 Misc.2d 509, 593 N.Y.S.2d 745 (Sup.Ct.1993), the defendant was brought to the grand jury room in handcuffs but was released from his restraints before entering the room to testify. However, upon completion of his testimony he was seen by the grand jurors in handcuffs while waiting in the vestibule for transportation back to jail. The court ruled that defendant was thereby deprived of his right to a fair and just grand jury proceeding. In People v. Calate, 178 Misc.2d 190, 678 N.Y.S.2d 861 (Sup.Ct.1998), an indictment was dismissed where the defendant was forced to testify before the grand jury "shackled at the hands and feet." Id. at 862. The court determined that by requiring the defendant to testify in this manner "the prosecutor in effect impinged on the function of the grand jury to assess believability." Id. at 863. See also People v. Felder, 201 A.D.2d 884, 607 N.Y.S.2d 793, 794-5, appeal denied, 83 N.Y.2d 871, 613 N.Y.S.2d 132, 635 N.E.2d 301 (1994)(finding error in requiring defendant to appear before grand jury in handcuffs without "a rational basis articulated on the record, for the restraint," but holding that reversal not warranted "where the prosecutor twice gave cautionary instructions to the Grand Jury, which dispelled any prejudice that may have resulted"). In both Calate and Marquez, there were no cautionary instructions. Similarly, there were none in this case. Of course, as the State correctly points out, in New York a defendant has a statutory right to testify before the grand jury that is considering his or her indictment. McKinney's CPL § 190.50(5). Thus, requiring a defendant to appear in restraints may properly be viewed as undermining the statutory right to testify.
In New Jersey, of course, a defendant has no right to appear before the grand jury unless subpoenaed or invited to testify with his or her consent. State v. *584 Spano, 64 N.J. 566, 568, 319 A.2d 217 (1974). As a result, the State argues, defendant was not forced to forfeit any constitutional or statutory right by appearing in handcuffs and shackles. Indeed, to the extent that defendant may be said to have had a right to appear without restraints, the State contends that he waived that right by agreeing to appear after learning that he could not do so without restraints. As noted, defendant did have an opportunity to consult with his attorney once the judge had declined to enforce his earlier order, and presumably decided after such consultation that an appearance in restraints was better than no appearance at all.
On balance, after carefully considering the competing interests involved, we conclude that once the assistant prosecutor agreed to allow defendant to testify, the State was obliged to insure that the appearance was as fair as possible in the circumstances. Specifically, the State having candidly and commendably recognized the inherent prejudice in requiring defendant to appear in restraints, the defendant should not have been compelled to forfeit that invitation or risk the ensuing prejudice unless there was no alternative. With respect to whether there were alternatives, the judge erred in abdicating his role as an arbiter of the competing interests involvedthe need for security versus defendant's wish, and the State's agreement, to let him testifyand refusing to take any further steps to enforce his earlier order.
Rather than bowing to the Sheriff's apparent recalcitrance, the judge should have immediately convened a hearing to determine whether law enforcement's legitimate security concerns could be met while at the same time minimizing prejudice to the defendant. Although corrections authorities "are given considerable latitude in [their] operation of the penal environment, [they] cannot dictate how our courts are to be run where considerations of justice, fairness, and due process are paramount." People v. Calate, supra, 678 N.Y.S.2d at 863. It is for the court to make "an independent evaluationincluding an evidentiary hearing, where necessaryof the need to restrain the party. Where restraints are deemed necessary, the ... judge must take steps to limit their prejudicial effect." United States v. Zuber, supra, 118 F.3d at 103. While the court should certainly take into account the opinions and supporting reasons of the corrections or court security officials, it may not delegate its responsibility to them. The decision as to what, if any, physical restraints are required is the sole responsibility of the judge. Lemons v. Skidmore, supra, 985 F.2d at 358; United States v. Zuber, supra, 118 F.3d at 105 (Cardamone, C.J., concurring).
In conclusion, we disagree with the State that "the prejudicial ramifications flowing from [defendant's appearance in restraints] at the grand jury level are far less devastating than [the] impact felt in the trial context and do not warrant vitiation of the indictment." To the contrary, we believe that under the unique circumstances presented here, defendant was deprived of a significant righta right created by the agreement between his counsel and the assistant prosecutorto have the grand jury assess his viable self-defense claim through a neutral prism, rather than one through which his credibility was distorted by restraints which could only impact negatively on his credibility, a vital consideration in the grand jury proceedings. In these circumstances, we conclude that defendant did not waive that right voluntarily; rather, defendant was forced to choose the "lesser of two evils," without a court having decided if such a *585 choice was necessary. We discern no true waiver in that situation. Cf. People v. Smith, 87 N.Y.2d 715, 642 N.Y.S.2d 568, 665 N.E.2d 138, 140-41 (1996).
The judge on remand will first determine what physical restraints, if any, are required. "Allowing a defendant to testify in shackles without a satisfactory record establishing the intense security need for such restraints is unacceptable to our justice system." People v. Calate, supra, 678 N.Y.S.2d at 863. In that regard, we note that most defendants, even those on trial for murder, are not handcuffed or shackled, as the many cases cited earlier demonstrate. And when some type of restraint is deemed necessary at trial, it is done as unobtrusively as possible. We question why the security concerns at trial should be greater than those before a grand jury. See Lemons v. Skidmore, supra, 985 F.2d at 359. We do not dictate a particular course of action in this case but leave the appropriate arrangements to the sound discretion of the court after hearing from all concerned. Of course, if any restraints are needed and are visible to the grand jury, a cautionary instruction should be given. Ibid.
Finally, since the case must be re-presented to the grand jury, we address defendant's contention that the presence of the sheriff's officers in the grand jury room constituted a violation of R. 3:6-6(a) which prohibits the presence of all but certain enumerated persons in the grand jury room. This argument was not raised below, and we therefore decline to consider it. Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). The motion judge will have the opportunity to consider the question in the first instance, and to take the rule into account in deciding whether any officers are needed in the grand jury room. We do note, however, that we do not subscribe to the State's position that sheriff's officers enjoy a recognized official status akin to a court stenographer, one of the specific categories of persons designated in the rule. See State v. Manney, 24 N.J. 571, 133 A.2d 313 (1957); United States v. Carper, 116 F.Supp. 817 (D.D.C.1953). Whether the rule can be accommodated with any perceived need for security is a matter we leave to the trial court in the first instance on remand. We also see no need to decide if the references to defendant's bail and immigration status were sufficiently prejudicial, standing alone, to have required dismissal of the indictment. On re-presentation we assume those statements will not be repeated.
The indictment is dismissed and the matter is remanded for re-presentation to the grand jury. At such re-presentation, defendant shall, consistent with the earlier agreement, be permitted to testify. Prior to such testimony, the court will hear the parties, take any necessary testimony, and determine what restraints, if any, will be necessary in the light of defendant's right to neutral conditions, taking into account as well, the demonstrated need for defendant to re-enact the incident using his hands.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] The quote, which we accept for present purposes, is from the State's brief.