**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3945-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JOSE GUADALUPE,

     Defendant-Appellant.

_____

Submitted October 25, 2021 – Decided November 10, 2021

Before Judges Fasciale and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Indictment Nos. 17-08-2162 and 17-08-2209.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Jill S. Mayer, Acting Camden County Prosecutor, attorney for respondent (Jason Magid, Special Deputy Attorney General/Acting Assistant Prosecutor, and Hannah M. Franke, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions for first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1); second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1); and second-degree possession of a firearm while committing a controlled dangerous substance (CDS)/bias crime, N.J.S.A. 2C:39-4.1(a).[1]

---

[1] In two separate indictments a grand jury charged defendant with committing various crimes.

In the first indictment (No. 17-08-2162) (the homicide indictment), he was charged with first-degree murder, N.J.S.A. 2C:11-3(a)(1)-(2); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a); and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1). He was tried by a jury for these crimes.

In the second indictment (No. 17-08-2209) (the drug indictment), he was charged with two counts of third-degree possession of a CDS (heroin), N.J.S.A. 2C:35-10(a)(1); third-degree possession with intent to distribute heroin, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3); first-degree possession with intent to distribute heroin, N.J.S.A. 2C:35-5(b)(1); third-degree possession with intent to distribute heroin within 1000 feet of a school, N.J.S.A. 2C:35-7; two counts of second-degree possession of a handgun in the course of a CDS offense, N.J.S.A. 2C:39-4.1(a); first-degree maintaining or operating a heroin production

On appeal, defendant raises the following arguments for our consideration:

POINT ONE

DEFENDANT'S MOTION TO DISMISS THE INDICTMENT WAS IMPROPERLY DENIED[.]

POINT TWO

DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL WAS IMPROPERLY DENIED[.]

POINT THREE

DEFENDANT WAS UNDULY PREJUDICED BY THE TRIAL [JUDGE'S] FAILURE TO INSTRUCT THE JURY AS TO THE PRINCIPLES OF IMPERFECT SELF-DEFENSE[.] (Partially Raised Below)

POINT FOUR

THE AGGREGATE SENTENCE OF [THIRTY-FIVE] YEARS [IN PRISON] WITH A PAROLE DISQUALIFIER OF 26.25 YEARS IS AN EXCESSIVE SENTENCE[.]

We disagree and affirm.

---

facility, N.J.S.A. 2C:35-4; and second-degree certain persons not to possess weapons, N.J.S.A. 2C:39-7(b)(1).  He pled guilty to second-degree (continued)
possession of a firearm while committing a CDS/bias crime, N.J.S.A. 2C:39-4.1(a), and the State dismissed the remaining charges.

A-3945-18

I.

On April 23, 2017, at 6:46 p.m., Officer Marcus Matthews and his partner responded to a ShotSpotter activation[2] on the intersection of North 18th Street and Pierce Street in East Camden. When they arrived at the intersection, Matthews saw a silver Mazda Protege crashed against a fence in a field at the dead-end of North 18th Street. The area surrounding the intersection of North 18th Street and Pierce Street included a housing complex, a church, a learning academy, a salvation army center, and residential dwellings, which were all located within two and a half blocks of the intersection. The area surrounding the intersection also included an early childhood development center and Camden High School.

Matthews approached the vehicle and saw "both front windows, the driver and passenger side windows, were shattered out." He noticed the vehicle was still running and saw the victim was unconscious and suffering from several gunshot wounds. The officers transported the victim to the hospital, where he was pronounced dead at 6:53 p.m. An autopsy revealed the victim suffered

---

[2] The ShotSpotter system alerts officers to a location of where shots were fired through a microphone system and notifies them how many rounds had been fired. Here, there were seven shots fired.

seven gunshot wounds to his right temple, right and left sides of his chest, right arm, right forearm, left forearm, and left elbow. The manner of his death was homicide.

At the crime scene, officers recovered a cell phone from the floor of the driver's side of the Mazda, seven shell casings, and a black and yellow glove located in the brush of the field on North 18th Street. Officers also observed tracks from an all-terrain vehicle (quad) at the scene. The State's firearms identification expert reviewed the seven shell casings recovered at the scene and opined that they all were .40 caliber and discharged from the same firearm. However, the firearm was never recovered. The glove that the State recovered was one commonly used to ride motorcycles and dirt bikes. The shell casings and glove were processed for fingerprints and DNA analysis, but none of the analyses was linked to defendant or anyone else.

Detectives extracted text messages from the day of the shooting from the cell phone recovered on the floor of the driver's side of the victim's vehicle. The phone belonged to the victim. The text messages were between the victim and a person named "Whip." The text messages show that at 3:07 p.m., Whip and the victim arranged to meet at Whip's mother's house, which was corroborated by surveillance video.

A-3945-18

Whip's cousin (the cousin) testified that he saw the victim earlier in the day on April 23, 2017, when the victim came to his house to get a red Xfinity bag that the victim had previously asked him to hold. He recalled the bag's handles were tied together, and the victim instructed him not to look inside the bag. He did not look inside the bag, but he believed it contained drugs because the victim sold heroin.

The cousin testified that defendant[3] did whatever Whip asked him to do. The cousin knew Whip owned quads and that only members of Whip's crew, which occupied the intersection of Third Street and Royden Street, were permitted to ride them. He was shown surveillance video footage and identified the victim, the victim's vehicle, and Whip at one of the surrounding intersections near the crime scene at 3:47 p.m.

The victim's fiancé (the fiancé) recalled that at around 6:30 p.m., the victim received a phone call from Whip. The fiancé said the victim said to Whip he had to see him. She recalled the phone conversation lasting less than a minute, and the victim immediately left.

Text messages from the victim's phone sent at 6:03 p.m. and 6:08 p.m. indicated that the victim and Whip would meet at their "spot." At 6:40 p.m., the

---

[3] The cousin knew defendant as "C.J."

victim texted Whip asking where he was. At the time these text messages were sent, surveillance video captured an individual riding a red and yellow quad driving in the direction of the shooting and making a turn at the intersection of North 18th Street and Pierce Street. The victim's vehicle approached the intersection at 6:44 p.m.

On April 24, 2017, Detective Christopher Sarson interviewed defendant at the prosecutor's office. The interview was videotaped and shown at trial. In the video, defendant waived his Miranda[4] rights and agreed to speak with detectives about the homicide one day earlier. He stated he heard about the homicide from his family. On the date of the homicide, he was at the garage shop where he worked for most of the afternoon, except for leaving to go to Third Street at 1:00 or 1:30 p.m. and to have dinner at his girlfriend's house at 10:30 p.m. He then fell asleep at the shop as he was working on a car until 3:00 a.m. He claimed that he did not know the victim. He said he knew Whip as a customer at the shop and considered him like "family."

On April 24, 2017, detectives were able to obtain surveillance video footage near the intersection of the homicide and the area surrounding it. The relevant footage showed an individual riding a red and yellow quad driving away

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

7

at a high rate of speed by the intersection next to the homicide.

On May 11, 2017, defendant was interviewed again by Sarson. This interview was also videotaped and shown at trial. Again, defendant waived his Miranda rights. Sarson said to defendant "[w]e know you killed him." He said he believed defendant was not telling the truth due to further investigation conducted after his first statement. He explained to defendant there were "numerous videos" and "multiple witnesses" that defendant was riding the red and yellow quad. He stated to defendant that there was "all kinds of evidence" pointing to defendant committing the homicide. For example, he told defendant a riding glove was discovered at the crime scene, and defendant confirmed the glove was his.

Defendant admitted he lied in his first statement about his involvement, but it was unclear whether he was referring to the homicide, the drug transaction, or both. However, he continued to deny involvement and then requested to see his girlfriend. He stated that he would not be speaking until he saw his girlfriend.

Defendant's girlfriend arrived, she asked why he did not speak with a lawyer, and he responded, "[b]ecause I haven't seen one, and I know they ain't going to get me a lawyer, so I'm gonna do this on my own." He further stated,

8

"[t]here's no getting out of it, to tell a lawyer. I'm just going to make it through with them, I'm gonna tell them about things, you know, and I'm just going to take it from there." His girlfriend then left the room. Defendant was sniffling and crying and then confessed that he killed the victim.

He explained that Whip owed the victim money, and that defendant was blamed for the missing money as a "scapegoat." He stated that Whip did not have the money to pay the victim. He clarified that he was told by Whip that:

> [DEFENDANT]: I had to go and meet up with [the victim] because he was going to hand me some stuff. And then when he handed me the stuff[,] I wasn't going to be able to hand him the money. I know [the victim] carries a gun. And I know how they move. So[,] it's either give them the money or he was going to shoot me.
>
> [SARSON]: Okay.
>
> [DEFENDANT]: And I already had gotten threatened by him before that.
>
> [SARSON]: By [the victim].
>
> [DEFENDANT]: I'm gonna kill you, I'm gonna fuck you up. I'm tired of y'all bullshit. Every time y'all come down, y'all got a different story, blah, blah, blah, this and the third. I had nothing to do with it. I was just the messenger.
>
> [SARSON]: You were just a transporter, right.
>
> [DEFENDANT]: Yeah, and then you're threatening me

A-3945-18

that you're going to end my life. Then they're sending me in a situation where I know that's the outcome of it. You know what I mean? It's either going to be you or me.

[SARSON]: All right.

[DEFENDANT]: You know what I mean? I'm not saying he pulled out a gun on me. No self-defense. I did it.

He also stated:

[DEFENDANT]: I did it. I don't know why, because I wasn't thinking about nothing. I was scared shit when I got on the bike, when I left, to the point where I parked the bike. I jumped out. I took all my clothes –

[SARSON]: What do you mean by that? What did you, what did you put on? What were you wearing when you were on the bike?

[DEFENDANT]: Exactly what you see on the pictures.

Prior to defendant's confession, Sarson showed defendant surveillance video footage taken from the intersection of Third Street and Royden Street on the day of the shooting at 7:48 p.m. Defendant identified himself as the individual wearing black pants and gray sneakers. When shown the portion of the video of an individual riding a red and yellow quad wearing the same black pants and gray sneakers, defendant denied that was him.

Defendant described the route he took to the location of the homicide,

A-3945-18

naming the intersections he passed, which was corroborated by surveillance video. He waited for the victim to tell him where he was and parked his quad behind a tree. He used his personal phone to contact the victim, but he could not recall the phone number and stated he only called the victim and was not texting him.

Defendant owned two phones. He said Whip did not use either of his phones the day of the homicide. Officers were able to identify the number of the phone texting the victim and linked it to Whip.

Defendant waited for the victim by a cement barrier at the dead end on North 18th Street. The cement barrier was corroborated by a photograph taken by officers at the crime scene. Defendant recalled observing two kids riding their bicycles while he waited. After defendant's confession, Sarson obtained and reviewed additional surveillance video, and that footage corroborated the two kids riding bicycles. Defendant said that, after the victim arrived, he walked up to the passenger side of the vehicle and saw the victim "reach back for something," but he saw the bag he was supposed to pick up. He further stated:

> [DEFENDANT]: So[,] he's reaching back for something. I wasn't going to wait. I'm going to keep it real with you. I know when this – this –
>
> [SARSON]: No, –

11

[DEFENDANT]: – it's about I always carry a gun with me when we moving the transaction. You never know what might go down.

On cross-examination, Sarson confirmed that defendant stated he saw a tan and orange bag on the front passenger side seat of the victim's vehicle and not a red Xfinity bag.

Defendant stated:

I thought he's going to shoot me. I'm not going to wait to see if he's really pulling out the gun and he's going to shoot me. He had threatened me already before. So I'm not going to wait. It was either him or me. That's the way I took it at the moment.

He fired multiple shots until "the whole gun was empty." The gun he was carrying was a .45, and he stated that he left it at the shop. He did not have a permit to carry a gun. He also did not take the bag from the victim. He was not sure what had happened with the bag. He stated that Whip did not instruct him to kill the victim.

Defendant explained the route he took after committing the shooting, which was corroborated by surveillance video, and he stated he left his bag at the parking lot at Camden High School. His bag contained a riding vest, hoodie, and goggles. He did not know if his bag was still at the parking lot; it was not recovered. He further stated that he discarded one of his gloves and that the

other glove fell off while he was riding.

Defendant described the route he took after he dropped off his bag at the parking lot and stated that he went to Whip's parents' home and parked the red and yellow quad in a lot across the street, which was corroborated by surveillance video. He marked on a map provided by Sarson the area where he stopped after the shooting, including where he dropped off his bag.

At trial, defendant recanted his confession. He testified that he did not shoot the victim, did not know who shot the victim, did not see the victim on April 23, 2017, and did not own a handgun. He further stated that he was not the person riding the quad as shown on surveillance video. Although he knew who the victim was, he stated he never called, texted, or had any relationship with the victim.

Defendant testified that he previously confessed because he was threatened by Whip and took the blame because he felt "[s]cared, frightened, worried, concerned." He had known Whip since 2015, became close with him after Whip's brother's death, and Whip was a frequent customer at the garage shop. He did whatever Whip asked him to do because, if not, there would be altercations such as Whip striking him. He recalled one instance when Whip pulled out a gun and shot it towards the ground during an argument. He did not

 A-3945-18

report any of his altercations with Whip to the police because he had seen people "either end up dead or badly injured" after reaching out to police. He could not recall any names of these people, nor did he witness any of these alleged occurrences.

Defendant explained that, on the night of April 23, 2017, he overheard a conversation between Whip and other individuals. Defendant testified that Whip then,

> told me that he needed me to take the blame for something that was going on and that he was going to make sure I was taken care of and they were going to [do] the right thing. I said no, and then he pretty much caught a negative attitude and told me that either I would do what he said, if not there were going to [be] . . . consequences. Either me or my family were going to pay the consequences.

He described an incident a week before his confession, where he was on his way to the liquor store when two individuals wearing face masks and black clothes from top to bottom began punching and kicking him. He felt a "weapon" on his head and recalled being told, "[e]ither you do what you were told or if not you're going to see what's going to happen to you or your family." He did not flee once he was threatened because he was not going to "leave my family to their luck, not knowing what was going on. I mean, first of all I . . . had nothing to run away from. I wasn't guilty. I didn't commit no crimes. Why should I run

14

from something that I didn't do?"

Defendant did not tell detectives about this incident because he was scared and feared for his life, and he said, "I just pretty much just mind my business. I had nothing to do with it, so I had no reason to tell them nothing about it." He did not tell anyone else about the incident because he

> didn't want to put nobody in my family or . . . nobody at risk. And at the same time[,] I didn't [know] who to approach and who to trust. You know, what I mean at the same time I could have told anybody that could have just forwarded the message to somebody else. And then they could have found out that I was trying to speak or tell the authorities and God knows what could have happened.

He also testified that he did not want to speak with an attorney when he gave his confession because his

> understanding [was that] there was no point of getting a lawyer. I mean, I was taking the blame for something that to my knowledge I know I didn't commit.

Defendant said he lied to detectives because he had been convicted of crimes in the past. He testified as to his three prior convictions, which were all drug offenses. He explained that he was trying to make his confession "credible to the point that they could actually believe me so pretty much my family would be . . . out of harm's way." He decided to tell the truth after his confession because his family members no longer resided in New Jersey.

15

Defendant testified that he knew where the location of the cement barrier was because he was familiar with the area. He stated he knew two children were riding on their bikes because when Sarson was reviewing the videos with him, he saw the children in the video and added it to his confession to make it seem more credible. However, on cross-examination, Sarson testified that he did not show defendant video of the children riding their bikes because all the videos were archived in separate folders, and that video was not relevant until after defendant made his confession. Defendant further testified that he knew the routes that the shooter took because he overheard the details of the conversation at the garage shop concerning the routes and how the individuals had to go back and recover a glove.

## II.

Defendant contends the judge erred in denying his motion to dismiss the homicide indictment because the State's case was based on his uncorroborated confession. He argues that the State presented no evidence to the grand jury that identified him as the shooter. Specifically, DNA testing of the glove was not matched to him, and surveillance video only corroborated the route taken but failed to detect him as the shooter. Although surveillance video footage was not shown to the grand jury, the judge did not abuse his discretion by denying the

motion to dismiss the homicide indictment because Sarson's description of surveillance video footage corroborated details of defendant's confession. The judge, therefore, denied defendant's motion and found defendant's confession was corroborated, and the judge based his finding on defendant's "extremely detailed statement" and surveillance video footage corroborating his confession.

"A defendant is entitled to a 'fundamentally fair grand jury presentation.'" State v. Shaw, 455 N.J. Super. 471, 481 (App. Div. 2018) (quoting State v. Grant, 361 N.J. Super. 349, 356 (App. Div. 2003)). The grand jury's core purpose is to "determine whether the State has established a prima facie case that a crime has been committed and that the accused has committed it." State v. Hogan, 144 N.J. 216, 227 (1996). "It is the duty of the grand jury to bring to trial individuals who are probably guilty and to clear the innocent of baseless charges." State v. Triestman, 416 N.J. Super. 195, 204 (App. Div. 2010).

"[A] court should dismiss an indictment 'only on the clearest and plainest ground,' and only when the indictment is manifestly deficient or palpably defective." State v. Twiggs, 233 N.J. 513, 531-32 (2018) (internal quotations omitted) (quoting Hogan, 144 N.J. at 228-29). A decision on whether to dismiss an indictment is addressed to the sound discretion of the trial judge and will be reversed only for an abuse of discretion. State v. Warmbrun, 277 N.J. Super.

51, 60 (App. Div. 1994).

"The court should evaluate whether, viewing the evidence and the rational inferences drawn from that evidence in the light most favorable to the State, a grand jury could reasonably believe that a crime occurred and that the defendant committed it." State v. Morrison, 188 N.J. 2, 13 (2006). "[T]he evidence need not be sufficient to sustain a conviction, but merely sufficient to determine that there is prima facie evidence to establish that a crime has been committed." State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 27 (1984). For example, "[a] grand jury may return an indictment based largely or wholly on hearsay testimony." State v. Vasky, 218 N.J. Super. 487, 491 (App. Div. 1987).

During the grand jury proceedings, Sarson was presented as the only witness. Sarson testified that on April 23, 2017, a ShotSpotter was activated recognizing someone fired seven rounds at 6:44 p.m. near the intersection where the victim was found. He described the items that were recovered, specifically seven .40 caliber shell casings, a riding glove, and quad tracks. He then described surveillance video identifying a male riding a red and yellow quad at a high rate of speed next to the intersection where the victim was found immediately after the shooting.

Sarson testified as to defendant's confession on May 11, 2017. He stated

how defendant voluntarily waived his Miranda rights and initially denied knowing or having any involvement with the victim's homicide. However, after confronted with surveillance video, defendant requested to see his girlfriend before telling detectives any further details. After seeing his girlfriend, defendant confessed and stated, "I did it, I killed [the victim] I'm not going to lie to you, I did it." Sarson described that defendant identified himself as the individual riding the red and yellow quad on the surveillance footage shown to him, admitted that the recovered glove was his, and described the routes he took before and after the shooting. Sarson then described surveillance videos corroborating the routes defendant detailed in his confession.

Sarson testified before the grand jury that someone riding a red and yellow quad was seen leaving the area where the victim was found immediately after the shooting. At the scene where the victim was found, quad tracks were identified, and a riding glove and seven .40 caliber shell casings were recovered. After Sarson described the route defendant stated he took before and after the shooting, Sarson described the surveillance videos corroborating the routes defendant stated. There was sufficient evidence presented by the State establishing a prima facie case that a crime had been committed and that defendant had committed it. Morrison, 188 N.J. at 13.

III.

Defendant contends the judge erred by denying his motion for judgment of acquittal because, again, the State's case was based on his uncorroborated confession. He argues that his convictions should be reversed and that he should be acquitted.

Under Rule 3:18-1, a court may enter a judgment of acquittal for the defendant if, at the close of either the State's case or after all evidence has been submitted, "the evidence is insufficient to warrant a conviction." A trial court's denial of a motion for acquittal "shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. The reviewing court must determine

> whether the evidence viewed in its entirety and giving the State the benefit of all of its favorable testimony and all of the favorable inferences which can reasonably be drawn therefrom is such that a jury could properly find beyond a reasonable doubt that the defendant was guilty of the crime charged.
>
> [State v. Moffa, 42 N.J. 258, 263 (1964).]

"On such a motion the trial judge is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State." State v. Muniz, 150 N.J. Super. 436, 440 (App. Div. 1977).

20

In State v. Reddish, our Supreme Court reaffirmed the rule that a defendant's confession alone is insufficient to establish guilt beyond a reasonable doubt: "[T]he State must 'introduce independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.'" 181 N.J. 553, 617 (2004) (quoting State v. Lucas, 30 N.J. 37, 62 (1959)). Nevertheless, judgments of acquittal should not be granted on these grounds if "the State provides 'any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy.'" Ibid. (quoting Lucas, 30 N.J. at 62). The State's burden is rather low. Id. at 618.

Defendant moved for a motion for judgment of acquittal at the close of the State's case. The judge denied the motion because he found the State presented evidence corroborating defendant's confession. The judge focused on the portion of defendant's confession where he stated he saw two kids riding their bikes and how the quad tracks were identified at the location that defendant described after the shooting.

Although the judge acknowledged there was a question about whether defendant was identifiable in the surveillance videos, the videos corroborated

A-3945-18

the route he took before and after the shooting. The judge noted that the State would not have known to look at certain cameras but for defendant's description of the routes taken. The judge also found that the text messages corresponded with the time the ShotSpotter was activated and that lay witnesses confirmed that Whip's crew on Third Street drove quads.

DNA and fingerprint testing did not link defendant as the shooter, and the judge acknowledged that surveillance video did not clearly depict the person shown. But additional evidence in the record supports the judge's decision that defendant's confession was corroborated through surveillance video footage. In his confession, defendant detailed the routes he took before and after the shooting. He described the intersections and buildings he passed with great clarity. He admitted in his testimony that he was familiar with the area. His testimony was inconsistent with his confession concerning him seeing the two children riding their bikes. He testified that he saw the children in one of the videos Sarson showed him and decided to add that detail to make his confession seem more credible. However, Sarson testified he did not show defendant the video with the children because he was not even aware about that detail until after defendant's confession. In fact, but for defendant's confession, officers would not have known to search other cameras to corroborate the route

22

defendant took before and after the shooting.

Additionally, defendant described in his confession what he was wearing and what color quad he was driving, which was corroborated in the surveillance video as well as photos of the quad tracks taken near the scene where the victim was found. He further stated he fired multiple shots until the "gun was empty." Although he stated the firearm he used was a .45 and the firearm was never recovered, seven .40 caliber shell casings were found near the victim's vehicle. Finally, a riding glove, which he admitted was his, was recovered at the scene.

IV.

Defendant asserts he was unduly prejudiced due to the trial court's failure to charge imperfect self-defense when instructing the jury. He argues "that the jury lacked the ability to 'piece together' a verdict for manslaughter without having been instructed as to the principles of imperfect self-defense." Defendant submits that his conviction for aggravated manslaughter should be reversed, and the matter be remanded for a new trial.

During the charge conference, defendant did not request an imperfect self-defense charge but did raise the issue, albeit somewhat obliquely. Defendant argued for the inclusion of reckless manslaughter as an alternative charge for the jury to consider because the jury could infer from the testimony and evidence

 A-3945-18

that he fired the shots at the victim recklessly as opposed to knowingly or purposefully. In discussing whether the judge should charge the lesser included offense, defense counsel stated that "a road map for . . . for this jury to find reckless manslaughter" would be through an "imperfect self-defense theory." "[I]f they think that, then they could find their way, I think, to second degree reckless manslaughter."

The trial judge acknowledged that testimony did reveal the circumstances when defendant saw the victim reach into the back seat, especially since he had no money to pay the victim for the drugs. The judge stated that the jury could possibly "piece it together themselves." He noted that there was an agreement not to give a self-defense charge, and he decided to charge murder, aggravated manslaughter, and reckless manslaughter.

The judge instructed the jury as to purposeful/knowing murder, aggravated manslaughter, and reckless manslaughter. The judge did not instruct the jury concerning imperfect self-defense, and defendant did not object to the jury charge.

To the extent defendant's contention had not been raised, we note that an appellate court may consider allegations of error not brought to the trial court's attention under the plain error rule. R. 2:10-2. Plain error is error that is "clearly

24

capable of producing an unjust result." Ibid. In terms of its effect in a jury trial, the error must be "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971). The alleged error must be viewed in "totality of the entire charge" and if there is no prejudicial error, the verdict stands. State v. Nero, 195 N.J. 397, 407 (2008) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)). Nevertheless, on this point, we see no error, let alone plain error.

The New Jersey Supreme Court has held that the Criminal Code "does not provide an independent category of justification, excuse, or mitigation under the concept of imperfect self-defense." State v. Bowens, 108 N.J. 622, 626 (1987). However, such evidence may be "relevant to the presence or absence of the essential elements of Code offenses." Ibid. As the Court stated:

> If a defendant subjectively thinks that self-defense is necessary but does not intend fatal injury, in either the sense of knowledge or purpose, such evidence is relevant to the State's case on that issue. If such a defendant is aware that his or her acts create a risk of serious harm but unreasonably disregards that risk, then, if the essential elements of the crime are present, the defendant can be found guilty of manslaughter . . . instead of murder.
>
> [Id. at 641.]

The Court defined imperfect self-defense as meaning "an honest

subjective belief on the part of the killer that his or her actions were necessary for his or her safety, even though an objective appraisal by reasonable people would have revealed not only that the actions were unnecessary, but also that the belief was unreasonable." Id. at 628.

Defendant argues his state of mind was presented to the jury through the State's introduction of his statement, during which he said:

> I've never been a violent person. I'm always the type of person that when there's a violent situation I'm walking away. Look, you got that. You're right. I'm wrong. Bye. And I'll just leave. But I felt intimidated. I thought that my life was at stake. And then me seeing him reach towards the back of the seat, I thought he's going to shoot me. I'm not going to wait to see if he's really pulling out the gun and he's going to shoot me. He had threatened me already before. So I'm not going to wait. It was either him or me. That's the way I took it at the moment.

Defendant acknowledges that he did not allege the killing was justified by self-defense, but he contends that during the jury charge conference the "statement detailed above had injected into the case evidence of so-called imperfect self-defense, i.e., that defendant acted under the honest, but unreasonable, belief that he was protecting himself when he shot [the victim]." Even though he was convicted of the lesser included offense of aggravated manslaughter, he argues "that fact doesn't render any error in failing to charge

26

imperfect self-defense harmless."  In support of this assertion, he cites State v.

Pitts, 116 N.J. 580 (1989).

In Pitts, the New Jersey Supreme Court reaffirmed the holding in Bowens

that

> not every claim of imperfect self-defense leads to an
> aggravated manslaughter charge.  The predicate for
> such an instruction, when it is based on evidence of
> imperfect self-defense, is that such evidence either
> negates the mental state required for murder, or
> demonstrates acts of provocation on the part of the
> victim to an extent sufficient to afford the jury a
> rational basis for convicting the defendant of one of the
> Code's forms of manslaughter.
>
> [Pitts, 116 N.J. at 605-06.]

But Defendant's reliance on Pitts is misplaced as he testified that he did not shoot

and kill the victim, thereby negating any rational basis for a charge of imperfect

self-defense.

In State v. Coyle, the Court found no error in the trial court's decision not

to instruct the jury on imperfect self-defense because the "trial court's

instructions on the capital offense properly encompassed only purposeful

murder and the lesser-included offenses of aggravated manslaughter, reckless

manslaughter, and passion/provocation manslaughter."  119 N.J. 194, 228

(1990).  The Court reiterated the holding in Bowens that since the theory of

imperfect self-defense was not recognized in the Code, "[t]he trial court need not charge separately that imperfect self-defense would serve to reduce murder to an unspecified degree of manslaughter." Ibid. (quoting Bowens, 108 N.J. at 637) (internal quotation marks omitted).

The State cites State v. Pridgen, 245 N.J. Super. 239 (App. Div. 1991), which defendant also contends supports his argument that the jury should have been instructed on imperfect self-defense. In Pridgen, the defendant, although indicted for murder, was convicted of aggravated manslaughter. Id. at 241. The defendant requested the trial court instruct the jury on imperfect self-defense and passion/provocation manslaughter, which it did not do. Id. at 245. The trial court charged the jury on murder, aggravated manslaughter, reckless manslaughter, and self-defense. Ibid. This court reversed and held the trial court erred by failing to explain the impact of imperfect self-defense on a murder charge to ensure that the jury understood the effect of an unreasonable but honest belief in the need to use force. Id. at 246-47. However, because the defendant was convicted of aggravated manslaughter, which only required a reckless culpability, the defendant suffered no harm or prejudice. Id. at 248. The court further held that "instructions on imperfect self-defense, to the extent authorized in State v. Bowens, should not be given with respect to the crimes of aggravated

manslaughter or reckless manslaughter." Ibid.

In State v. Vasquez, 265 N.J. Super. 528, 540 (App. Div. 1993), the defendant did not request a jury instruction on imperfect self-defense. The trial court charged the jury with murder, aggravated manslaughter, passion/provocation manslaughter, and reckless manslaughter. Id. at 552. This court held no error occurred, stating:

> In light of the fact that the trial court instructed the jury on murder, aggravated manslaughter, passion/provocation manslaughter, and reckless manslaughter, no need arose for the judge to charge on imperfect self-defense. Any instruction as to defendant's honest but unreasonable belief that he needed to use force would have placed him at the scene of the murder, thereby prejudicing the strategy chosen by defense counsel. Defendant never claimed that he had to use force. No plain error resulted from the judge's failure to charge imperfect self-defense.
>
> [Ibid.]

Here, the judge was not required to instruct the jury on imperfect self-defense. Instead, the judge correctly instructed the jury on murder, aggravated manslaughter, and reckless manslaughter. Defendant's reliance on Pridgen is unpersuasive because the court instructed the jury on aggravated and reckless manslaughter, and he was convicted of aggravated manslaughter instead of murder. Additionally, defendant's position at trial was that he did not shoot and

kill the victim. Like in <u>Vasquez</u>, defendant did not request the charge of imperfect self-defense and "[a]ny instruction as to defendant's honest but unreasonable belief that he needed to use force would have placed him at the scene of the murder, thereby prejudicing the strategy chosen by defense counsel." <u>Ibid.</u>

V.

Defendant contends the judge imposed an excessive sentence. He asserts the judge erred by running the sentence for aggravated manslaughter consecutive to the sentence for certain persons not to have weapons because "the crimes were committed on the same day, at the same time, in the same place, and with the same weapon." He also argues the judge did not consider "the real-time consequences of [the No Early Release Act (NERA)]."

For aggravated manslaughter, the judge sentenced defendant to twenty-five years in prison subject to NERA, N.J.S.A. 2C:43-7.2. On his conviction for certain persons not to have weapons, the judge imposed a consecutive extended prison term of ten years with a five-year period of parole ineligibility. The judge found aggravating factors of three, six, and nine outweighed mitigating factors five and nine.

Notably, defendant was eligible for an extended term as to the aggravated

manslaughter charge as he was a persistent offender. See N.J.S.A. 2C:44-3. N.J.S.A. 2C:43-7(a)(1) governs extended terms for defendants convicted of first-degree aggravated manslaughter. A defendant convicted of first-degree aggravated manslaughter is eligible for an extended term between thirty years and life imprisonment. N.J.S.A. 2C:43-7(a)(1). The judge noted that defendant's previous convictions were all non-violent drug offenses and he participated in drug court.

When reviewing a trial court's sentencing decision, "[a]n appellate court may not substitute its judgment for that of the trial [judge]." State v. Johnson, 118 N.J. 10, 15 (1990). However, it may

> (a) review sentences to determine if the legislative policies, here the sentencing guidelines, were violated; (b) review the aggravating and mitigating factors found below to determine whether those factors were based upon competent credible evidence in the record; and (c) determine whether, even though the court sentenced in accordance with the guidelines, nevertheless the application of the guidelines to the facts of this case makes the sentence clearly unreasonable so as to shock the judicial conscience.
>
> [State v. Roth, 95 N.J. 334, 364-65 (1984).]

In determining whether to impose consecutive or concurrent sentences, courts must be mindful of public policy in which "there can be no free crimes in a system for which the punishment shall fit the crime." State v. Yarbough, 100

N.J. 627, 643 (1985). The court shall consider the facts relating to the crimes, including whether:

> (a) the crimes and their objectives were predominantly independent of each other; (b) the crimes involved separate acts of violence or threats of violence; (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior; (d) any of the crimes involved multiple victims; (e) the convictions for which the sentences are to be imposed are numerous[.]

> [Id. at 644.]

Here, the judge found the aggravated manslaughter and weapons offenses were "separate and apart from each other." The judge based his finding on defendant's statement that he carried a firearm every time he was involved in an illegal drug transaction. The judge found the crimes were committed at different times, in that the weapons offense occurred across several hours on April 23, 2017, while the shooting occurred at a fixed point in time. Under these facts, the judge found that no single period of aberrant behavior existed. Finally, the judge stated that to impose a concurrent sentence on the certain persons charge would violate the principle of "[t]here are to be no free crimes in a system in which the punishment shall fit the crime."

As noted above, defendant contends that "the trial [judge's] determination

that the certain persons crime was independent from the shooting is palpably erroneous" because the crimes were committed on the same day, same time, same place, and with the same weapon. However, the record supports the judge's finding that the offenses were separate and apart. While the offenses did occur in proximity in time and location and defendant did state that he always carried a firearm when conducting a drug transaction, each of the offenses have different elements.

To the extent that we have not addressed defendant's remaining arguments, including that the trial judge did not consider the "real-time consequences of NERA," we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3945-18